GEORGE BEADLING, PLAINTIFF-RESPONDENT, v. E. BER-
NARD SIROTTA, DEFENDANT-APPELLANT, AND SAM-
UEL M. LANGSTON COMPANY, A NEW JERSEY CORPO-
RATION, DEFENDANT-APPELLANT.

Argued January 21, 1964—Decided March 2, 1964.

Mr. *Sidney P. McCord, Jr.* argued the cause for the defendant-appellant, E. Bernard Sirotta (*Messrs. McCord, Farrell & Eynon,* attorneys).

Mr. *Charles A. McGeary* argued the cause for the defendant-appellant, Samuel M. Langston Company (*Messrs. Bleakly, Stockwell & Zink,* attorneys).

Mr. *Martin L. Haines* argued the cause for the plaintiff-respondent (*Messrs. Dimon, Haines & Bunting,* attorneys).

The opinion of the court was delivered by

PROCTOR, J. The plaintiff, George Beadling, seeks damages from Dr. E. Bernard Sirotta, a radiologist, for injuries and losses sustained as the result of an allegedly negligent diagnosis and report made by the doctor respecting the health of the plaintiff. He also seeks damages from Samuel M. Langston Company on the theory of *respondeat superior,* contending that Dr. Sirotta was the agent of Langston in making the diagnosis and report.

This case is before us for the second time. In *Beadling v. Sirotta,* 39 *N. J.* 34 (1962), we vacated an order of the

Appellate Division granting leave to the defendants to appeal from the interlocutory order denying their motion for summary judgment (see 71 *N. J. Super.* 182 (*Law Div.* 1961)), for the reason that pertinent facts relevant to the legal issues there involved were not set forth in the record. On remand, the trial court, sitting without a jury, found in favor of the plaintiff against both defendants and awarded damages of $4,700. Both defendants appealed, and while the matter was pending in the Appellate Division, we certified it on our own motion. *R. R.* 1:10–1(a).

The issues raised on this appeal are whether Dr. Sirotta breached a duty owed by him to the plaintiff resulting in plaintiff's losses, and if so, whether defendant Langston is vicariously liable for Dr. Sirotta's negligence. Since we find that negligence by Dr. Sirotta has not been established, both defendants must prevail on this appeal, and it is unnecessary for us to consider the question of vicarious liability.

Plaintiff sought employment on September 15, 1958, as a machinist with the defendant Langston. His technical qualifications were acceptable, and pursuant to the practice of the company, he was asked to take a pre-employment physical examination which included a chest X-ray. He was referred to Dr. Paul T. Milnamow, the plant physician, for the physical examination, and an appointment was made for him with Dr. Sirotta for the following day for the X-ray. Accordingly, on September 16, 1958, Dr. Sirotta at his office took an X-ray of plaintiff's chest. The X-ray was developed while plaintiff waited. Dr. Sirotta, finding some abnormality, asked the plaintiff whether he had ever been in a sanitarium, when he had last had a chest X-ray, and whether he had recently had a chest cold or a history of a chest condition. Plaintiff said he might have had an X-ray in 1955 and that he had never been in a sanitarium and had no history of chest trouble. He then asked the doctor if something was wrong and if it would keep him from getting a job. The doctor answered affirmatively to both questions but did not reveal the nature of the trouble. He told the plaintiff to report back to Langston.

Upon his return to the Langston plant, plaintiff discussed the results of the X-ray with the assistant personnel manager, Stephen Monoky. According to the plaintiff, Monoky told him he had reinfected active tuberculosis and advised him to consult his family physician. Plaintiff nevertheless asked whether there was not some other position he could fill and was told that under the circumstances there was none.

Dr. Sirotta testified that he telephoned the nurse at the Langston plant and, based on his reading of the wet plate, told her that there was a suggestion of reinfection tuberculosis. The nurse testified that she received a telephone call from Dr. Sirotta's office reporting the wet reading of the X-ray as unacceptable since it showed areas which were not normal. She transmitted this information to Monoky, who testified that he told the plaintiff his X-ray showed lesions or shadows which indicated a possibility of tuberculosis and suggested that he see his family doctor to determine whether or not he had the disease.

Dr. Sirotta sent a written report of his radiographic examination of the plaintiff's chest to Dr. Milnamow. The letter, dated September 16, 1958, was received at the Langston plant two or three days later. It contained the following report:

"Radiographic examination of the chest revealed the following:
There is an area of infiltration involving a good portion of the upper right lung representing active reinfection pulmonary tuberculosis. I cannot detect any cavitation at this time. A pleura diaphragmatic adhesion is at the left base. The remaining lung fields are clear. The cardiac silhouette is normal in all respects.
Conclusions: We are dealing with active reinfection pulmonary tuberculosis involving the right lung, minimal in extent."

Dr. Sirotta testified that a wet film reading is not as accurate as a dry film reading due to technical difficulties, and for that reason he reported to the nurse that on a wet-reading the X-ray showed a "suggestion" of tuberculosis. The above-quoted report was based on a reading of the dry film.

After his conversation with Monoky on September 16, plaintiff went home and telephoned his family physician, Dr.

Silpe. Plaintiff, who had been advised by a friend not to rely on a single X-ray report but to get another doctor's opinion, suggested to Dr. Silpe that additional X-rays be taken. Dr. Silpe agreed and referred him to Dr. Albert Oppenheimer, a radiologist, who took a series of X-rays of plaintiff's chest the following morning. Dr. Oppenheimer reported to Dr. Silpe that the X-rays revealed "infiltration of the apical segment of the right upper lobe with small cavity" and recommended that "infection" (including tuberculosis) be excluded as a cause of the abnormality by bacteriological study, bronchoscopy, and other tests. Dr. Silpe arranged for the hospitalization of the plaintiff, and he was admitted to the hospital for study and treatment under the care of Dr. Hyman Rosenberg on the following day, September 18, 1958, with a referral diagnosis of possible tuberculosis. Dr. Rosenberg examined the X-rays taken by Dr. Oppenheimer and concluded that "this was a case of tuberculosis until proven otherwise."

Plaintiff was hospitalized for eleven days, during which period various tests were made. Skin tests for fungus infections, gastric washings, sputum, and smear tests were negative. Other routine tests such as urinalysis, blood count, blood sugar, and blood urea nitrogen were normal. The sedimentation rate was elevated, and a first strength mantoux test was read "a two plus, first strength." Dr. Rosenberg described the significance of this result as "at one time or other this individual had tuberculosis. It is not a sign of necessarily active tuberculosis, but there might be active tuberculosis, or it may have been present in the past." Plaintiff was discharged after these tests were run and was confined to his home for approximately six weeks to await the results of certain of the tests not immediately available. On discharging the plaintiff, Dr. Rosenberg advised Dr. Silpe that plaintiff was to be treated as tubercular until proven otherwise, and he prescribed drugs used in the treatment of tuberculosis.

On November 15, 1958 Dr. Oppenheimer again X-rayed plaintiff's chest. He testified that at that time "everything

had disappeared. There are no abnormal shadows. * * * It is a normal lung now." Plaintiff then obtained a letter from Dr. Silpe which stated that he had completely recovered from a "questionable active pulmonary tuberculosis," that his X-rays showed a healed scar, and that he could return to work with no restrictions. Plaintiff returned to Langston with this letter and was told there were no jobs available at that time but that he would be considered for any future job opening provided he could pass a physical examination. In January 1959 Langston called the plaintiff and told him they had a job available. He was sent to Dr. Meidt, a chest specialist, for X-rays and evaluation of his chest. Dr. Meidt performed a physical examination, took a complete history, a fluoroscopy of his chest, and X-rays. In addition he examined the earlier X-rays taken by Dr. Sirotta and Dr. Oppenheimer. In his written report to Dr. Milnamow, Dr. Meidt diagnosed plaintiff's condition as "pulmonary tuberculosis minimal in the right upper lobe." He stated that it was impossible to classify the lesion he found as inactive since there had not been stable X-rays for three months. However, in his opinion the lesion had responded extremely well to the short-term medication and therefore the plaintiff was employable, subject to continuation of anti-tuberculosis medication for a minimum of one year. Langston, however, felt compelled to refuse employment to the plaintiff at that time since there was no way it could be assured that plaintiff would continue his medication.

In May 1959 plaintiff returned to Dr. Oppenheimer who again X-rayed his chest and found it to be normal.

"Active tuberculosis," according to the record, means that the disease is either improving or retrogressing, and a diagnosis of "reinfection tuberculosis" means that it is an adult type of tuberculosis which is the breaking down of a primary lesion which may have been present for years. The results of bacteriological tests, which if positive can confirm the existence of tuberculosis as indicated by an X-ray, if negative are not necessarily conclusive as to its absence, for the patient must be watched thereafter and treated as a suspect.

On this appeal Dr. Sirotta first contends that there was no physician-patient relationship between him and the plaintiff but that his contract with Langston merely required him to observe the condition of the plaintiff's chest and report to Langston facts bearing on his employability. Accordingly, he argues that no duty to the plaintiff was breached by his fulfillment of that contract. Whether or not a physician-patient relationship exists, within the full meaning of that term, we believe that a physician in the exercise of his profession examining a person at the request of an employer owes that person a duty of reasonable care. See *Louisell and Williams, Trial of Medical Malpractice Cases,* § 8.02 (1962 Supp.); 5 *Personal Injury Newsletter* 16 (*Apr.* 9, 1962). It is clear that the doctor cannot negligently burn him by overexposure to X-ray during the examination without incurring liability. On the other hand, the scope of the duty owed is clearly not coextensive with the duty owed to a private patient who seeks from the doctor a report as to the status of his health. Whether a duty to discover and disclose physical impairment is owed to the pre-employment examinee is difficult to resolve. Concededly, the employer has its prospective employees examined primarily for its own benefit. Thus, the duty to discover, at its broadest, is limited by the needs of the employer. Moreover, it is clearly in the public interest in the maintenance of good health to examine prospective employees and to deny employment to those whose health may endanger other workers, and we hesitate to put unnecessary roadblocks in the path of such beneficial social conduct. Even where chest X-rays are made and read in the course of mass tubercular surveys, for the benefit primarily of the examinee, it is doubtful that the same duty would be owed the examinee as in the case of a private consultation at the patient's request. *Cf. Battislella v. Society of The New York Hospital,* 9 *A. D.* 2d 75, 191 *N. Y. S.* 2d 626, 629–630 (*App. Div.* 1959). However, on the facts of the present case we need not decide the scope of the duty owed to such examinees, for even assuming

a duty was owed to the plaintiff to examine and report with reasonable care, we find no evidence of its breach.

Testimony on behalf of the plaintiff regarding good medical practice was given by plaintiff's expert, Dr. Oppenheimer. He testified that Dr. Sirotta's only deviation from proper medical standards was that in his written report to Dr. Milnamow he labeled the infiltration shown on his X-ray as active reinfected tuberculosis, whereas the proper conduct would have been merely to report the infiltration and recommend that tuberculosis be excluded as its cause by bacteriology, bronchoscopy, and other studies. In his opinion it isn't usual to make a diagnosis of tuberculosis on the basis of radiographic findings alone, since the radiologist sees only the result of an infection and not the microbe itself. It is to be noted that Dr. Oppenheimer confirmed the presence of the infiltration reported by Dr. Sirotta, both on the basis of his own X-rays and on his reading of Dr. Sirotta's X-ray.

The plaintiff contends that the breach of this standard of good medical practice was negligent with respect to him and that it resulted in his failure to obtain employment with Langston and in addition caused him to incur hospital and medical expenses and suffer discomfort.[1] The question thus presented is whether Dr. Sirotta, by reporting his findings in unqualified terms rather than stating his findings and recommending the exclusion of tuberculosis as a cause thereof, created an unreasonable risk of harm to the plaintiff. The general theory of liability for negligent conduct is stated by Harper & James as follows:

"Every man is in general bound to use care and skill in his conduct wherever the reasonably prudent person in his shoes would recognize unreasonable risk to others from failure to use such care." *Torts*, § 28.1, at *p*. 1535 (1956)

---

[1] We do not reach the question of causal connection between Dr. Sirotta's conduct and plaintiff's hospitalization since we find that no negligence has been shown. However, we note that plaintiff entered the hospital on the advice of his family physician, Dr. Silpe, after consultation with Dr. Oppenheimer.

If Dr. Sirotta owed a duty to the plaintiff to report his findings in terms which would not subject the plaintiff to an unreasonable risk of harm, still it is important to distinguish the present case from a situation where the diagnosis is incorrect because it is based on a faulty reading of an X-ray. *Cf. Battistella, supra.* Here, the negligence alleged consists solely in the manner of reporting accurate findings.

At the trial and on this appeal considerable emphasis has been given by the plaintiff to the written report sent by Dr. Sirotta to Dr. Milnamow, and this report appears to have been the primary basis for a finding of negligence by the trial court. The report was not received at Langston until September 18 or 19, two or three days after plaintiff was denied employment and told he had tuberculosis, and the contents of the report were not communicated to him until some time after he left the hospital. Since plaintiff's failure to obtain employment and his hospitalization occurred before the written report was received by Langston, it cannot be the basis for a finding of negligence at that time. Moreover, the written report was addressed to and intended for a fellow physician. All medical experts who testified, including Dr. Oppenheimer, agreed that radiographic findings indicating the presence of tuberculosis cannot be conclusive but must be confirmed by further studies. There is no suggestion that Dr. Milnamow would accept Dr. Sirotta's conclusion as anything more than an expression of his opinion, which, like all opinions based on X-ray findings, could not be definitive. There is no unreasonable risk of harm to others created by such conduct. We cannot find negligence in the choice of words used in communications between physicians under circumstances in which all would agree they understand each other.

Notwithstanding the absence of negligence arising from Dr. Sirotta's written report to Dr. Milnamow, the question remains whether under the plaintiff's view of the facts, Dr. Sirotta was negligent with respect to the oral report of "active reinfected tuberculosis" transmitted to him by Monoky. While we have grave doubt whether any statement made by an

employer can be attributed to the examining physician where, as here, the gravamen of the negligence is a matter of the words spoken, we will assume for the purpose of this decision that the statement made by Monoky to the plaintiff is attributable to Dr. Sirotta.

Dr. Oppenheimer testified to a standard of reporting X-ray findings by radiologists in their communications with other physicians. We are asked to determine, in the absence of expert evidence specifically directed to the question, whether this standard is equally applicable to a report of X-ray findings made to a prospective employee and if so, if its violation would create an unreasonable risk of injury to him, thus making the violation negligent. Though a physician may want technical precision in a report of X-ray findings, the prospective employee will neither understand nor benefit from a report in esoteric terms such as Dr. Oppenheimer's "infiltration in the apical segment of the right upper lobe with small cavity." He will want an interpretation of such terms if he is to understand the condition found to exist, and we believe it would not be unreasonable to tell him that the X-ray indicated a possibility of tuberculosis. Accordingly, we do not believe that the standard enunciated by Dr. Oppenheimer for reporting findings to other physicians is applicable to communications to a prospective employee. But, even assuming that a report of "possible" tuberculosis might be preferable in view of the inherent limitations of radiography, we do not believe that a report of "active reinfected tuberculosis, see your doctor" would create an unreasonable risk of harm to the prospective employee. Indeed, in the present case the evidence is undisputed that further studies, such as those made of the plaintiff's condition, should be conducted on the basis of the radiographic findings alone, irrespective of the language used in reporting their significance. It is also clear that no risk of injury to the plaintiff with respect to his employability exists by reason of the language of the report, for Langston would undoubetdly deny employment and its attendant association with co-employees to one suspected of

having tuberculosis. In any event, we cannot impose liability where, as here, the negligence alleged so closely approximates a matter of mere semantics.

For the reasons stated above the judgment of the trial court against both defendants is reversed.

*For reversal* — Chief Justice WEINTRAUB, and Justices JACOBS, FRANCIS, PROCTOR, HALL, SCHETTINO and HANEMAN—7.

*For affirmance*—None.