294 N.J. Super. 182 (1996)
682 A.2d 1220
PENICE RANIER, PLAINTIFF-APPELLANT,
v.
LAWRENCE FRIEMAN, M.D., DEFENDANT-RESPONDENT, AND ANTHONY SAHAR, M.D., MARIANNE SAHAR, M.D. AND DR. RUSSELL SECKENDORF, DEFENDANTS.
Superior Court of New Jersey, Appellate Division.
Argued September 10, 1996.
Decided September 27, 1996.
*183 Before Judges PRESSLER, STERN and WECKER.
*184 Robert Santaloci argued the cause for appellant (Dwight P. Ransom, attorney; Mr. Santaloci, on the brief).
Paul F. Schaaff, Jr. argued the cause for respondent Lawrence Frieman, M.D. (Orlovsky, Moody, Schaaff & Gabrysiak, attorneys; Mr. Schaaff, on the brief).
The opinion of the Court was delivered by PRESSLER, P.J.A.D.
The question raised by this appeal is whether a physician retained by the Department of Labor, Division of Disability Determinations (Division) to examine a claimant for social security disability benefits has a duty to the examinee to exercise reasonable professional care in rendering a diagnosis. We are persuaded that the examining physician has that duty, at least with respect to the symptoms and complaints on which the examinee has based the disability claim. Accordingly, we reverse the summary judgment dismissing the complaint of plaintiff Penice Ranier against defendant Lawrence Frieman, a board certified ophthalmologist.
These are the facts that appear from this sparse record. Plaintiff had been employed for some twenty-six years by EAI Electronic Associates in Eatontown as a PC board driller. In 1991, when he was forty-eight years old, he was unable to continue to work because of vision problems he claimed to be having. He also suffered from hypertension and other physical problems and had been under the general care of defendants Anthony Sahar and Marianne Sahar, his family physicians, from some time in 1973 until September 9, 1991. According to Dr. Anthony Sahar's written report to the Division in November 1991, plaintiff first complained of his vision problems during an office visit on April 15, 1991, plaintiff's first in two years. Dr. Sahar reported that among other symptoms, plaintiff noted his "decreased vision causing him to be unable to drive a car...." Dr. Sahar then conducted an eye examination and "found no physical explanation for his decreased vision and suggested he see an optometrist if the *185 condition continued." Dr. Sahar's report of plaintiff's visits between that date and the date of the last visit in September 1991 makes no further reference to eye problems.
It appears that prior to his April 15, 1991, visit to Dr. Sahar, plaintiff had already applied for social security disability benefits and had been referred by the Division to defendant Russell Seckendorf for examination. Dr. Seckendorf's report to the Division of his April 2, 1991, examination noted, among plaintiff's other symptoms, a complaint of poor vision. Dr. Seckendorf administered eye chart tests as part of his overall examination and ultimately concluded that plaintiff's health was fairly good although "[h]is eyesight could be better." The disability claim was denied.
Plaintiff's vision problems continued unabated. Still unable to work, he again applied for social security disability benefits. The Division this time referred him to Dr. Nicholas Arcomano for a general medical examination, which Dr. Arcomano conducted in early June 1992. His report to the Division noted that although plaintiff suffered from a fairly well controlled hypertension, his primary problem was his vision. This is what the report said in that regard:
This 49-year-old male is applying for disability because of several complaints. First and foremost, his visual fields he alleges are so impaired that he cannot judge distance appropriately. His depth perception is off and he claims he nearly killed himself and another person while driving his car particularly if there are oncoming lights.
He further alleges that lights bother his eyes and that they "hurts my eyes and I can't" see clearly. Even the sun does it. He has not seen any ophthalmologist in recent years because "I cannot afford it." The last eye refraction was at Pearle Vision Center. He has worked at EAI Electronic Associates Industry in Eatontown for the past 26 years as a driller in PC boards which are needed to put electric wires through. This requires fine vision eight hours a day.
He was unable to continue that for awhile because of his vision but the firm recalled him in 1991. He resumed his former occupation but could not work because of his weak eyes.
In his final diagnosis, Dr. Arcomano found "[i]mpaired vision with visual acuity both eyes  cause is not clear." Noting plaintiff's "marked visual impairment," he recommended an ophthalmological *186 consultation which "potentially ... might be a significant factor of employability."
Based on Dr. Arcomano's recommendation, the Division referred plaintiff to defendant Dr. Frieman, a board certified ophthalmologist. Dr. Frieman's report of his examination of July 24, 1992, noted "a normal ocular examination," diagnosed myopia (nearsightedness) and presbyopia (farsightedness), and opined that "[t]here is also the possibility of malingering in view of the patient's variable responses on vision testing and the tunnel visual fields with normal confrontation visual fields and the patient not having any difficulty in ambulation." Dr. Frieman further reported that he had advised plaintiff to "follow-up with his own Ophthalmologist," advice plaintiff denied having received. Based on Dr. Frieman's report, the disability claim was rejected.
Plaintiff's problems persisted, and in January 1993, he finally saw his own ophthalmologist, Dr. Richard Angrist. Dr. Angrist's findings based on various office tests, apparently including some of the same tests conducted by Dr. Frieman, led him to refer plaintiff for MRI studies. Those tests revealed a large brain tumor in the optic chasm, which was the cause of his visual difficulties. Plaintiff underwent surgery for removal of the tumor and was treated by follow-up radiation. He was then finally accorded disability benefits.
The gravamen of plaintiff's action against the physicians is that each in turn negligently failed to diagnose the brain tumor, thereby preventing him from having obtained earlier and less intrusive treatment, contributing to the severity and permanency of his ensuing disability, and resulting in an unnecessarily prolonged pre-operative period of pain and suffering.
Defendant Frieman moved for summary judgment dismissing the complaint as against him, asserting that he owed no duty to plaintiff to exercise reasonable care in the making of his diagnosis. The trial court agreed and granted the motion. We granted plaintiff's motion for leave to appeal and now reverse.
*187 The linchpin of defendant Frieman's argument is that since he was retained by the Division to examine plaintiff on its behalf and to report only to it, there was never a physician-patient relationship between him and plaintiff. Thus, he contends, he owed no duty to plaintiff to render a professionally reasonable diagnosis since that duty arises only when a physician-patient relationship exists. It is his further assertion that this rather startling legal proposition is supported by and is consistent with Beadling v. Sirotta, 41 N.J. 555, 197 A.2d 857 (1964). We are, however, persuaded that defendant both misreads and overreads Beadling. We are also satisfied that there is nothing in the decisional law of this jurisdiction and, indeed, nothing in the common understanding of the community regarding medical professional standards that would immunize a physician from liability for a professionally unreasonable diagnosis to the substantial detriment of the examinee, even if the examination is made at the expense and behest of a third party. This is particularly so where, as here, the examination is not made in the primary interest of the third party, such as the pre-employment physical involved in Beadling, but at the behest of a governmental agency needing to know what, if anything, is wrong with the examinee in order properly to process a disability claim.
Beadling is an appropriate starting point for our analysis. That case involved the allegation that defendant, the radiologist to whom the plant physician had referred plaintiff for chest x-rays, had negligently reported that an abnormality appearing thereon was evidence of an active tuberculosis infection rather than a healed tuberculosis scar without expressly indicating the need for further tests to confirm that diagnosis. The Court, reviewing the proofs, concluded that irrespective of the scope of the duty a physician in those circumstances owes to the examinee to examine and report with reasonable care, there had been, in any event, no evidence at all that such a duty had been breached. Id. at 561-562, 197 A.2d 857. Nevertheless, the Court explained in dictum, even though the "third-party" examination does not create a physician-patient relationship "within the full meaning of that *188 term, we believe that a physician in the exercise of his profession examining a person at the request of an employer owes that person a duty of reasonable care." Id. at 561, 197 A.2d 857. The question then is simply whether the duty of reasonable care in the situation before us imposes upon the "third-party" physician the duty to make a professionally reasonable diagnosis.
To begin with, we reject defendant's contention that Beadling limits the duty of reasonable care in this situation to the physician's merely refraining from inflicting an injury on the examinee during the course of the examination, such as, for example, overexposure to radiation or other such misadventure. We regard the Court's reference to affirmative infliction of injury as illustrative, not exhaustive, of the reasonable care standard in respect of a "third-party" examination.
We reach that conclusion for several reasons. First, Beadling itself does not suggest that affirmative infliction of injury is the sole possible deviation from reasonable care in the absence of a full and traditional physician-patient relationship. Rather, we read Beadling to hold that the substantive content of reasonable care in the third-party situation is dependent upon relevant negligence principles applied consistently with appropriate public policy concerns. We are also persuaded that the Court's articulation of relevant negligence principles since Beadling compels a more expansive definition of reasonable care in these circumstances. That is to say, the Court's limitation of the reasonable care standard in Beadling was expressly based on the absence of a traditional professional relationship between physician and patient and the consequent absence of the privity between them that historically triggers the full panoply of professional responsibility. Since Beadling, however, the Court has effectively eliminated privity as a prerequisite for the imposition of liability. As the Court explained in Carter Lincoln-Mercury v. EMAR Group, 135 N.J. 182, 196, 638 A.2d 1288 (1994), "duty is defined not by the contractual relationship between the parties but by considerations of foreseeability and fairness...." See also Snyder v. American *189 Ass'n of Blood Banks, 144 N.J. 269, 292, 676 A.2d 1036 (1996) ("The absence of a contractual or special relationship is not dispositive [of a legally cognizable duty]"). The Court has, moreover, extended this principle to professional negligence, eliminating the prerequisite of a patient or client relationship as a necessary element of professional malpractice. Consequently, the Court has expressly recognized that a professional's duty of care is owed not only to his patient or client but also to those third parties who will foreseeably and reasonably rely on his skill and care in the performance of a particular professional undertaking. Thus, in Petrillo v. Bachenberg, 139 N.J. 472, 484, 655 A.2d 1354 (1995), the Court imposed liability on attorneys whose professional negligence causes damage to persons, other than their clients, who reasonably and foreseeably rely on their skill and care. See also H. Rosenblum v. Adler, 93 N.J. 324, 352, 461 A.2d 138 (1983) (independent auditor owes duty to recipients of its client's financial statements); Carter Lincoln-Mercury, supra, 135 N.J. at 196, 638 A.2d 1288 (an insurance broker "owes a duty of care not only to the insured with whom the broker contracts but also to other foreseeable parties injured by the broker's or agent's negligence"). And see Safer v. Estate of Pack, 291 N.J. Super. 619, 677 A.2d 1188 (App.Div. 1996), in which this court recognized the physician's duty to one other than the patient to give timely warning of genetic risks of which the physician is aware.
It is well settled that the existence of a duty is a question of law to be determined by the court as a matter of fairness and policy and by "weighing the relationship of the parties, the nature of the risk, and the public interest in the proposed solution." Strachan v. John F. Kennedy Memorial Hosp., 109 N.J. 523, 529, 538 A.2d 346 (1988). See also Snyder v. American Ass'n of Blood Banks, supra, 144 N.J. at 292, 676 A.2d 1036; Carter Lincoln-Mercury, supra, 135 N.J. at 194-195, 638 A.2d 1288. We apply this principle here unburdened by constraints of privity and appreciating that all of the attributes, responsibilities, obligations and consequences of the physician-patient relationship do not *190 obtain to the limited professional contact between the examining physician and the plaintiff here. Thus the question before us is simply whether, as a matter of fairness and policy and considering the other relevant determinants of the existence of a duty, the Division's examining physician had a duty to the examinee as well as to the Division to make a professionally reasonable and competent diagnosis. We have no doubt that the answer to this question must be affirmative.
Certainly plaintiff here, at least prima facie, relied, both reasonably and foreseeably, on the examining physician's diagnosis. Clearly, he relied thereon with respect to his entitlement to disability benefits. Moreover, with respect to his asserted reliance on the diagnosis in making his own subsequent medical decisions, there is a reasonable factual dispute respecting the communication to him of the diagnosis, the manner of that communication, and the foreseeability both of the communication itself and his consequent reliance thereon.
As to public policy, we perceive no countervailing consideration to the imposition on the examining physician of a duty to the examinee to make a professionally competent diagnosis. The Division certainly has no personal interest in the outcome of the diagnosis  its role is to fulfill the public mandate of awarding benefits to disabled workers. The physician obviously has a duty to the Division to make a professionally competent diagnosis. Imposing on the physician the same duty to the examinee involves the Division in no conflict of interest or counter-incentive. Compare Beadling, in which the Court noted, in the context of the pre-employment physical, that
concededly, the employer has its prospective employees examined primarily for its own benefit. Thus, the duty to discover, at its broadest, is limited by the needs of the employer. Moreover, it is clearly in the public interest in the maintenance of good health to examine prospective employees and to deny employment to those whose health may endanger other workers, and we hesitate to put unnecessary roadblocks in the path of such beneficial social conduct. [Id. at 561, 197 A.2d 857.]
Here, to the contrary, the interests of the Division and the examinee are considerably more congruent. Both need to know, *191 as fully and accurately as possible, what the examinee's physical condition really is, and the Division has no legitimate interest in the matter other than the obtaining of that information for the fulfillment of its public purpose. The obtaining of that information is ultimately the examinee's sole legitimate interest as well.
We are also persuaded that the imposition on the examining physician of a duty to the examinee to make a professionally competent diagnosis comports with community understanding and experience. We have little doubt that the lay public expects that a person required by a public agency to submit to a physical examination by its designated physician for diagnosis of specific complaints will receive a professionally competent examination and diagnosis, at least vis-a-vis those complaints. We are further persuaded that that expectation is altogether reasonable and entitled to fulfillment. Holding the physician liable to the examinee for a professionally negligent diagnosis advances that interest.
We have canvassed the law of other jurisdictions and acknowledge that the majority rule, based on privity and usually applied in the pre-employment examination context, rejects the notion of the examining physician's liability to the examinee for a professionally negligent diagnosis. See generally cases collected in Annot., "Medical Examination  Physician's Duty," 10 A.L.R.3d 1071 and supplement thereto (1966). There is, however, a minority view with which we are in full accord. See Green v. Walker, 910 F.2d 291 (5th Cir.1990), interpreting Louisiana law and holding as follows:
when an individual is required, as a condition of future or continued employment, to submit to a medical examination, that examination creates a relationship between the examining physician and the examinee, at least to the extent of the tests conducted. This relationship imposes upon the examining physician a duty to conduct the requested tests and diagnose the results thereof, exercising the level of care consistent with the doctor's professional training and expertise, and to take reasonable steps to make information available timely to the examinee of any findings that pose an imminent danger to the examinee's physical or mental well-being. To impose a duty upon the doctor who performs such tests to do so in accordance with the degree of care expected of his/her profession for the benefit of the employee-examinee, as well as the employer, is fully consistent with the very essence of Civil Code article 2315. [Id. at 296.]
*192 See also Meinze v. Holmes, 40 Ohio App.3d 143, 532 N.E.2d 170 (1987); Stark v. Fry, 129 A.D.2d 237, 517 N.Y.S.2d 643 (4th Dept. 1987) (dissenting opinion of Green, J.).
We add these caveats. We do not intend to impose upon the examining physician the same scope of duty as is owed to the traditional patient. We address only the specific professional function undertaken by the examining physician. We simply hold that when an examinee presents himself with specific complaints that are the occasion for the third-party reference for the examination, the examining physician owes the examinee the duty of examining and diagnosing the examinee in the same professional manner and with the same professional skill and care as would be employed in examining and diagnosing a "traditional" patient with those complaints.[1] Indeed, we would think that a physician's professional and ethical obligations imposed by the license to practice would demand no less. Finally, we do not intend to suggest that defendant Frieman was in fact professionally negligent in his diagnosis. That is a matter to be determined at trial after a proper opportunity for discovery.
Reversed and remanded for further proceedings consistent herewith.
NOTES
[1] Clearly a physician, unable to make a diagnosis without further tests or specialist consultation or both, must so report to the retaining agency, as indeed Dr. Arcomano did here.