NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 15-1012
_____

LINDA S. SKELCY,
Individually and as General
Administrator and Administrator ad
Prosequendum of the Estate of James T. Skelcy,
                                             Appellant

v.

UNITEDHEALTH GROUP, INC;
OXFORD HEALTH INSURANCE, INC;
DENISE BEIGHE, M.D., individually and as an employee/agent
of Medical Evaluations Specialists, Inc.; MEDICAL EVALUATION
SPECIALISTS, INC.; DENNIS SANDOVAL, M.D., individually
and as an employee/agent of UnitedHealth Group; GAIL WILDER,
M.D., individually and as an employee/agent of UnitedHealth Group
_____

On Appeal from the United States District Court
for the District of New Jersey
(D.C. No. 3-12-cv-01014)
District Judge:  Hon. Anne E. Thompson
_____

Submitted Under Third Circuit L.A.R. 34.1(a)
September 18, 2015

Before:  FISHER, CHAGARES, and JORDAN, *Circuit Judges*.

(Filed: September 22, 2015)

_____

OPINION[*]
_____

JORDAN, *Circuit Judge*.

Appellant Linda Skelcy, in her individual capacity and as the administratrix of the estate of her husband, James Skelcy, asks us to reverse an order of the United States District Court for the District of New Jersey dismissing her complaint against Medical Evaluation Specialists, Inc. ("MES") and Dr. Denise Beighe, M.D ("Dr. Beighe"). Because we agree with the District Court that neither MES nor Dr. Beighe owed a duty of care to Mr. Skelcy, we will affirm.

## I.    BACKGROUND

### A.    FACTUAL BACKGROUND[1]

In July of 2007, Mr. Skelcy was diagnosed with dermatomyositis, a connective tissue disease. Later, he was diagnosed with interstitial lung disease ("ILD"), as a secondary condition. At all relevant times, Mr. Skelcy was covered by a health insurance policy issued by UnitedHealth Group, Inc. ("UnitedHealth"), by and through Oxford Health Insurance, Inc. ("Oxford").

Mr. Skelcy was first treated with various first-line medications, but they proved ineffective. Then, in August 2009, his treating rheumatologist prescribed Rituximab

---

[*] This disposition is not an opinion of the full court and, pursuant to I.O.P. 5.7, does not constitute binding precedent.

[1] We recount the facts as alleged by the non-movant, Mrs. Skelcy, accepting them as true. *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009).

("Rituxan"), a common next-step therapy. UnitedHealth and Oxford (collectively "the UnitedHealth Defendants") approved and covered Mr. Skelcy's Rituxan treatments without delay or question. Mr. Skelcy received two doses of the drug, to which he responded very well. In fact, he responded so positively that he was able to maintain remission of his dermatomyositis and ILD for almost one full year with those two doses of Rituxan.

In July 2010, his symptoms returned. His treating rheumatologist immediately prescribed another dose of Rituxan, which was scheduled to be administered later that month. But, two days before the scheduled treatment, the UnitedHealth Defendants had still not approved the dose of Rituxan. Mr. Skelcy's treating rheumatologist therefore faxed a letter of medical necessity to Oxford expressing Mr. Skelcy's urgent need for a dose of Rituxan or an intravenous immunoglobin ("IVIG") infusion. The imminent need for one of the treatments was or should have been immediately apparent to the UnitedHealth Defendants, given Mr. Skelcy's deteriorating condition and prior response to Rituxan. Nevertheless, on the same day that they received the fax, the UnitedHealth Defendants denied the claim for Rituxan or an IVIG infusion. Mr. Skelcy's treating rheumatologist had numerous follow-up conversations with the UnitedHealth Defendants' representatives in which he explained the need for treatment. He also immediately responded by filing an "Expedited Utilization Review Appeal," as permitted by Mr. Skelcy's insurance policy.

Within two days of receiving the clinical information necessary to process the expedited appeal, the UnitedHealth Defendants transmitted the appeal to MES for a peer

3

review assessment. MES assigned Dr. Beighe, a rheumatologist located and licensed in Arizona, to provide the peer review assessment of the expedited appeal.[2] After reviewing the materials provided by Mr. Skelcy's treating rheumatologist, including medical records indicating that Mr. Skelcy had previously responded well to Rituxan, Dr. Beighe stated in her peer review assessment that, "[t]his type of therapy is not [the] standard of care for this disease" and "[t]his specific therapy is not [the] standard of care for this patient's disease." (App. at 49.) Dr. Beighe further specified that there was inadequate medical literature to conclude that Rituxan was effective in treating

---

[2] To determine whether the prescribed treatment was medically necessary for Mr. Skelcy, Dr. Beighe was presented with seven questions upon which to base her review:

1. Is this an FDA approved use of the requested medication(s)/service(s)?
2. Is this type of therapy "standard of care" for this disease/disease state?
3. Is this specific therapy "standard of care" for this patient's disease/disease state?
4. Is the clinical data from the prevailing peer-reviewed published medical literature adequate to conclude that the requested medication(s)/service(s) is effective in treating the member's condition? [I]f no- please go to question 5.
5. Are there at least two articles in the peer-reviewed literature that show that the proposed therapy is more likely to benefit the member than the standard of care, or other available therapies?
6. Are alternative therapies possible?
7. Is there sufficient data for your opinion?

(App. at 128-29.) The questions do not require or even encourage the reviewing physician to take a member's specific condition, treatment history, or a treating physician's recommendations into account. Dr. Beighe was instead asked simply to answer the non-specific, generic questions about the disease with which Mr. Skelcy was afflicted.

Mr. Skelcy's condition, but she also concluded that "IVIG would be [the] standard of care at this point for the member." (*Id.*)

The next day after receiving Dr. Beighe's assessment, the UnitedHealth Defendants again denied the request to treat Mr. Skelcy with Rituxan or an IVIG infusion. In an internal memorandum, the UnitedHealth Defendants stated, "[a] board certified rheumatologist has reviewed the request and has [determined] that the request for Rituxan should be denied as unproved. The clinical data from the prevailing peer reviewed published medical literature is not adequate to conclude that the requested medication is effective in treating the member's condition." (App. at 50.) Despite Dr. Beighe's specific recommendation in favor of an IVIG infusion, the UnitedHealth Defendants did not approve that therapy.

Approximately two weeks after the denial of Mr. Skelcy's expedited appeal, his treating rheumatologist faxed a letter to the UnitedHealth Defendants pleading that Mr. Skelcy had received Rituxan in August 2009 "with excellent response," and stating that the "patient is a father, is a husband, and the main bread winner of his family" and that "[a] further deterioration of his condition … is imminent." (App. at 50-51.) On August 9, 2010, thirty-two days after receiving Mr. Skelcy's claim for treatment, the UnitedHealth Defendants reversed their decision and approved the Rituxan treatment. The record reveals no explanation for their tragically belated change of heart. Within 36 hours of the UnitedHealth Defendants' decision to approve the Rituxan treatment, Mr. Skelcy died. The Union County Medical Examiner's Office determined that the

cause of death was chronic dermatomyositis, interstitial pulmonary fibrosis, endomyocardial fibrosis, and cardiac arrhythmia.

## B.    PROCEDURAL HISTORY

Mrs. Skelcy filed her First Amended Complaint on April 13, 2012, asserting, *inter alia*, claims for negligence and negligence per se against MES and Dr. Beighe.  On June 29, 2012, MES and Dr. Beighe filed a motion to dismiss all claims against them, advancing three arguments: (1) neither owed a duty of care to Mr. Skelcy; (2) the statute underlying the negligence per se claims did not impose a duty upon them; and (3) the court lacked personal jurisdiction over Dr. Beighe.  Mrs. Skelcy responded by filing a motion for leave to file a Second Amended Complaint, withdrawing the negligence per se claims.  She also opposed MES's and Dr. Beighe's motion to dismiss the negligence claims.

The District Court granted MES's and Dr. Beighe's motion to dismiss, reasoning that "there is both a lack of a demonstrable duty to Mr. Skelcy on the part of [MES or Dr. Beighe] and of causation." (*Id*. at 22.)  The Court said that, because neither MES nor Dr. Beighe had a special or contractual relationship with Mr. Skelcy, "there exists no grounds for traditional medical malpractice [or negligence] claims against Dr. Beighe" or MES.  (*Id*.)  Moreover, given that neither MES nor Dr. Beighe set the standard for review in the UnitedHealth Defendants' treatment approval process or made the final judgment on treatment certification, the District Court found no "sufficient nexus between the actions of [MES or Dr. Beighe] and Mr. Skelcy's death." (*Id*.)  The District Court also denied Mrs. Skelcy's motion to amend her remaining claims against MES and

6

Dr. Beighe, stating that any motion to amend the remaining negligence claims would be futile.[3]

The claims against the remaining defendants survived and the case proceeded through discovery. It was ultimately closed on December 5, 2014, pursuant to a settlement between Mrs. Skelcy and those defendants, thereby rendering the dismissal of Mrs. Skelcy's claims against MES and Dr. Beighe a final order subject to appeal. Mrs. Skelcy then timely appealed.

## II. DISCUSSION[4]

The District Court dismissed Mrs. Skelcy's claims against MES and Dr. Beighe because it found as a matter of law that neither defendant owed her a duty of care and also that she failed to demonstrate that their negligence, if any, caused Mr. Skelcy's death. Because we agree that neither defendant owed Mr. Skelcy a duty of care, we do not reach the second basis for the District Court's ruling.

"The fundamental elements of a negligence claim are a duty of care owed by the defendant to the plaintiff, a breach of that duty by the defendant, injury to the plaintiff proximately caused by the breach, and damages." *Robinson v. Vivirito*, 86 A.3d 119, 124

---

[3] The District Court, having disposed of Mrs. Skelcy's claims against MES and Dr. Beighe on Rule 12(b)(6) grounds, did not address Dr. Beighe's argument that she was not subject to the Court's personal jurisdiction.

[4] The District Court had jurisdiction under 28 U.S.C. § 1332. We have appellate jurisdiction under 28 U.S.C. § 1291. We exercise plenary review over a dismissal under Rule 12(b)(6). *Pearson v. Sec'y Dep't of Corr.*, 775 F.3d 598, 601 (3d Cir. 2015). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

(N.J. 2014). The existence of a duty and the scope of that duty are generally questions of law for the court to decide. *Carvalho v. Toll Bros. & Developers*, 675 A.2d 209, 212 (N.J. 1996). "[W]hether a duty exists is ultimately a question of fairness. The inquiry involves a weighing of the relationship of the parties, the nature of the risk, and the public interest in the proposed solution." *Reed v. Bojarski*, 764 A.2d 433, 443 (N.J. 2001) (internal quotation marks omitted). "A duty is said to arise out of the existence of a relationship between the parties such that social policy justifies its imposition." *Id.* (internal quotation marks omitted). Whether a physician owes any duty to an individual who is the subject of a peer review assessment as part of that individual's claim for health insurance coverage is a question that has not been addressed by the New Jersey Supreme Court. We must therefore "predict how the New Jersey Supreme Court would rule if presented with this case." *Repola v. Morbark Indus., Inc.*, 934 F.2d 483, 489 (3d Cir. 1991).

Mrs. Skelcy relies on a small set of cases to argue that, "under New Jersey law, no traditional doctor-patient relationship or special duty is required to maintain a cause of action for negligence against a physician … ." (Opening Br. at 14.) She asserts that, given the broad duty of care imposed upon physicians under New Jersey law, MES and Dr. Beighe owed her husband a duty of care, even though no privity or doctor-patient relationship bound him to them.

The first case presented as support is *Beadling v. Sirotta*, 197 A.2d 857 (N.J. 1964). George Beadling had applied for a job as a machinist. His would-be employer scheduled a pre-employment physical, which included a chest x-ray. Dr. Sirotta, the

8

radiologist who examined Beadling's x-ray, detected a lung abnormality that he believed was evidence of active tuberculosis. Dr. Sirotta told Beadling that something was generally amiss with the x-ray, but he did not reveal any details of the condition to Beadling. Instead, Dr. Sirotta disclosed those details to the would-be employer who decided not to hire Beadling. Dr. Sirotta did, however, subsequently communicate with Beadling's treating physicians, who were able to resolve the illness. Nevertheless, after undergoing a series of tests at the hospital and six weeks' home confinement, Beadling sued numerous parties, including Dr. Sirotta who had failed to immediately inform him of his malady. Dr. Sirotta defended on the ground that he had no physician-patient relationship with Beadling, and, therefore, no corresponding duty. The Supreme Court of New Jersey rejected Dr. Sirotta's absolute claim that the absence of a physician-patient relationship forecloses the existence of any duty, stating, "[w]hether or not a physician-patient relationship exists, … a physician in the exercise of his profession examining a person at the request of an employer owes that person a duty of reasonable care." *Id*. at 860. But the *Beadling* court did not define the scope of a physician's duty of reasonable care to an examinee because, "even assuming a duty was owed to [Beadling] to examine and report with reasonable care," the court found "no evidence of its breach" since Dr. Sirotta's post-examination communications had been instrumental in helping Beadling's treating physicians head off the tuberculosis. *Id*. at 861.

Mrs. Skelcy next relies on *Ranier v. Frieman*, 682 A.2d 1220 (N.J. Super. Ct. App. Div. 1996). The plaintiff in that case, Penice Ranier, claimed that his ability to work had been compromised by deteriorating vision, so he applied for social security

9

disability benefits.  In July 1992, the Department of Labor referred Ranier to Dr. Frieman, a board-certified ophthalmologist.  Dr. Frieman examined Ranier and, in his report, described the examination as a "normal ocular examination," diagnosed myopia (nearsightedness) and presbyopia (farsightedness), and opined that there was a possibility of malingering.  *Id*. at 1221.  Based on Dr. Frieman's report, the disability claim was rejected.  A few months later, Ranier's vision problems persisted.  After visiting his own ophthalmologist, a brain tumor was discovered in his optic chiasm, which was the cause of his declining eyesight.  Ranier sued Frieman, claiming that he had negligently failed to find the tumor.  Frieman moved for summary judgment.  He argued that, since he was retained by the Department of Labor to examine Ranier on its behalf and to report only to it, there was never a physician-patient relationship between him and Ranier, and, thus, he owed no duty to Ranier to render a professionally reasonable diagnosis.  The New Jersey Superior Court rejected Dr. Frieman's argument.  Relying on *Beadling*, the *Ranier* court recognized that "a professional's duty of care is owed not only to his patient or client but also to those third parties who will foreseeably and reasonably rely on his skill and care in the performance of a particular professional undertaking." *Id*. at 1223.  And, on the facts presented, the *Ranier* court concluded that, because Ranier had "relied, both reasonably and foreseeably, on the examining physician's diagnosis," Dr. Frieman had a duty, "as a matter of fairness," to Rainier as well as to the Department of Labor to make a professionally reasonable and competent diagnosis.  *Id*.

Finally, Mrs. Skelcy buttresses her argument that New Jersey law would impose a duty of care on MES and Dr. Beighe by relying upon *Reed v. Bojarski*, 764 A.2d 433

10

(N.J. 2001). Like *Beadling* and *Ranier*, *Reed* called upon a New Jersey court to further

define the boundaries of the duty of care that a physician owes to an examinee. In that

case, the decedent, Arnold Reed, underwent a pre-employment physical examination.

The would-be employer had contracted with Environmental Medicine Resources, Inc.

("EMR") to perform the examination. EMR subcontracted with Life Care Institute, Inc.

("Life Care") to perform physicals and medical imaging services, including evaluations

of pre-employment x-rays. Dr. Bojarski, an employee of Life Care, conducted Reed's

physical. A radiologist who examined Reed's chest x-ray told Dr. Bojarski that Reed had

a widened mediasternum, which may be an indicator of lymphoma, including Hodgkin's

disease. Dr. Bojarski subsequently sent the x-ray, along with the rest of Reed's

examination package to EMR. Reed stated in his report to EMR that the x-ray was

"abnormal," but he made no reference to the widened mediasternum. Two days after

Dr. Bojarski sent his report to EMR, the radiologist gave Dr. Bojarski a written report on

Reed's x-ray, recommending a follow-up CT scan, but Dr. Bojarski never conveyed that

suggestion or the report to EMR. About six months later, Reed was admitted to the

hospital and, after a chest x-ray showed a large mass in his mediasternum, he was

diagnosed with Stage IIB Hodgkin's disease. He died eight months later. Reed's widow

sued Dr. Bojarski and Life Care. At trial, the judge instructed the jurors that, if they

found that it was reasonable for Dr. Bojarski to forward the materials concerning Reed to

EMR and rely on EMR's contractual obligation to independently review the materials

and inform Reed of any adverse findings, then they could not find Dr. Bojarski negligent.

With that instruction, the jury unanimously found for Dr. Bojarski. The New Jersey

11

Supreme Court reversed. It held that, while a pre-employment examination does not establish a traditional physician-patient relationship, the examination still creates a relationship "in which a physician is expected to exercise reasonable care commensurate with his expertise and training, both in conducting the examination and in communicating the results to the examinee." *Id*. at 443. That is so, the court explained, because "the patient is entitled to rely on the physician to tell him of a potential serious illness if it is discovered. Any reasonable person would expect that and the duty to communicate with a patient who is found to be ill is non-delegable." *Id*.

Relying on those cases,[5] Mrs. Skelcy argues that MES and Dr. Beighe owed her husband a duty of care. In fact, she says, "[t]his matter presents a more compelling

---

[5] Mrs. Skelcy also briefly cites a somewhat related collection of cases in which New Jersey courts have held a professional liable to non-client third parties who reasonably and foreseeably relied on the professional's skill and care in the performance of a professional undertaking. *See Snyder v. Am. Ass'n of Blood Banks*, 676 A.2d 1036, 1054 (N.J. 1996) (holding that the American Association of Blood Banks owes a duty of ordinary care to persons receiving blood or blood products from its members, including the plaintiff who had no direct contact with the defendant but who contracted AIDS from a tainted unit of blood collected by one of its members); *Petrillo v. Bachenberg*, 655 A.2d 1354, 1361-62 (N.J. 1995) (holding that an attorney for a seller of real estate has a duty not to provide misleading information to potential buyers who the attorney knows, or should know, will rely on that information); *Carter Lincoln-Mercury, Inc., Leasing Div. v. EMAR Grp., Inc.*, 638 A.2d 1288, 1297-99 (N.J. 1994) (holding that an insurance broker engaged to obtain insurance on behalf of a prospective insured owes a duty to a loss-payee subsequently named on the acquired policy to place the insurance with a financially stable insurance carrier); *H. Rosenblum, Inc. v. Adler*, 461 A.2d 138, 154 (N.J. 1983) (holding the auditor of a corporation liable to all those whom the auditor should reasonably foresee as recipients from the audited company of its financial statements for its proper business purposes, provided that the recipients rely on the statements pursuant to those business purposes), *superseded by statute*, N.J. Stat. Ann. 2A:53A-25, *as recognized in Cast Art. Indus., LLC v. KPMG, LLP*, 36 A.3d 1049 (N.J. 2012); *Safer v. Estate of Pack*, 677 A.2d 1188, 1192 (N.J. Super. Ct. App. Div. 1996) (holding that a

12

context to impose a duty of reasonable care upon a physician, than the pre-employment examination context of *Reed*, *Beadling* and *Ranier*." (Opening Br. at 19). In those cases, the purpose of the physician's examination was not to affect medical treatment but to determine fitness for employment. Here, she argues, MES and Dr. Beighe were delegated a much weightier responsibility – reviewing and influencing whether a patient would have coverage for treatment or a procedure, potentially preempting a treating physician's opinions and interfering with patient care. Mrs. Skelcy contends that often only a physician in Dr. Beighe's position will have the requisite expertise to perform an independent review to decide the ultimate outcome of an insurance claim. And, she continues, the peer review that Dr. Beighe undertook caused the arbitrary denial of a proven treatment for Mr. Skelcy's deteriorating condition, which was a substantial factor in causing his death. According to Mrs. Skelcy, "[a]bsent the imposition of a duty upon the reviewing physician in this context, arbitrary coverage decisions will no doubt continue to result in the grave consequences underlying the current matter." (Opening Br. at 22.) Therefore, she says, the public policy principles inherent in analogous New Jersey cases strongly suggest that a duty should be imposed on MES and Dr. Beighe in this case. Furthermore, she points out, unlike the pre-employment examinees, "Mr. Skelcy pa[id] premiums in exchange for coverage of medically necessary treatments with the expectation that treatment would not be arbitrarily withheld." (*Id*. at 20.)

---

physician has a duty to warn a patient's immediate family members of avoidable harm from genetically transmissible diseases).

We sympathize with Mrs. Skelcy and share the sense of injustice prompted by the UnitedHealth Defendants' decision to delay her husband's treatment until it was too late to save his life. That does not mean, however, that, under New Jersey law, either MES or Dr. Beighe owed a duty of care to her husband.[6] The cases cited by Mrs. Skelcy demonstrate how New Jersey courts have liberally, but not heedlessly, extended remedies to non-patients injured by the actions or inaction of physicians. Mrs. Skelcy is correct that a traditional doctor-patient relationship or special duty is not required to maintain a cause of action for negligence against a physician in New Jersey, but we think she is likely wrong that New Jersey courts would impose a duty on facts such as the ones here. There is a clear and common thread running through *Beadling*, *Ranier*, and *Reed* that is absent here – each of those cases involved personal interactions with or affirmative acts by a physician that induced the injured party to foreseeably and reasonably rely on the physician to discover or disclose serious illnesses. While none of those cases found that a physician-patient relationship existed, they each relied upon the existence of *some* "relationship between the parties" that could be inferred from the parties' interactions and that entitled the injured party to rely on the physician's competency. *Reed*, 764 A.2d at 443 (internal quotation marks omitted).

The facts of this case are different in at least two significant ways. First, Mr. Skelcy had absolutely no interaction of any kind with Dr. Beighe. In fact, he apparently had no awareness that Dr. Beighe even existed, let alone that she was

---

[6] Our holding is strictly limited to the claims contained in Mrs. Skelcy's complaint. We do not opine whether entities and physicians could be liable as aiders and abettors in a scheme designed to deny insurance claims in bad faith.

14

performing services connected to his insurance claim. All Dr. Beighe did in connection with Mr. Skelcy's case was to review medical records and answer questions posed by the UnitedHealth Defendants. That difference undermines Mrs. Skelcy's claims against MES and Dr. Beighe, since *Reed* was clear that the "non-delegable duty" of care owed by a physician stems from the trust a patient places in the doctor after a relationship arises through personal interactions, in that case a physical examination. *Id.*; *see also Nolan v. First Colony Life Ins. Co.*, 784 A.2d 81, 86 (N.J. Super. Ct. App. Div. 2001) (holding that *Reed*'s reasoning has little purchase in a "commercial setting" where a healthcare professional reviewed a plaintiff's blood test results but did not form a relationship of "trust or reliance" with the injured party). Second, even assuming that Mr. Skelcy relied on Dr. Beighe's professional competence, which he did not, it was not the sort of reliance that New Jersey courts have protected in the past. In *Beadling*, *Ranier*, and *Reed*, New Jersey courts protected a person's ability to safely rely on a physician's implied or express representations when making medical decisions, such as selecting an appropriate course of treatment. But the reliance interest claimed here is completely distinct. Mr. Skelcy did not rely on Dr. Beighe to help him understand his physical condition or determine an appropriate course of treatment; if he had relied on Dr. Beighe at all, it was to help him get reimbursed for his desired course of treatment.

We thus doubt that the New Jersey Supreme Court would recognize a duty of care on these terribly sad facts.

15

**III.  CONCLUSION**

For the foregoing reasons, we will affirm the District Court's dismissal of the claims against MES and Dr. Beighe.