764 A.2d 433

LINDA REED, AS EXECUTRIX OF THE ESTATE OF ARNOLD S. REED, DECEASED, AND LINDA REED, INDIVIDUALLY, PLAINTIFF–APPELLANT, v. MICHAEL H. BOJARSKI, D.O. AND LIFE CARE INSTITUTE, INC., T/A LIFE CARE MEDICAL CENTER, DEFENDANTS–RESPONDENTS, AND D.A. DEPERSIA, M.D., ENVIRONMENTAL MEDICINE RESOURCES, INC., JOHN DOE, M.D.'S (A–Z) AND JANE DOE CORPORATIONS (A–Z) JOINTLY, SEVERALLY AND/OR IN THE ALTERNATIVE, DEFENDANTS.

Argued October 23, 2000—Decided January 23, 2001.

90

*Jay H. Greenblatt*, argued the cause for appellant (*Jay H. Greenblatt & Associates*, attorneys).

*Joel B. Korin*, argued the cause for respondents (*Kenney & Kearney*, attorneys).

*Steven N. Flanzman*, Deputy Attorney General, argued the cause for amicus curiae, New Jersey State Board of Medical Examiners (*John J. Farmer, Jr.*, Attorney General of New Jersey, attorney; *Andrea M. Silkowitz*, Assistant Attorney General, of counsel).

The opinion of the Court was delivered by

LONG, J.

The requirement of a physician's examination as a condition of employment, often paid for by the prospective employer, is not uncommon. This case focuses on the responsibility of a physician in such circumstances. More particularly, we are confronted with the question whether a physician, performing a pre-employment screening, who determines that the patient has a potentially serious medical condition, can omit informing the patient and delegate by contract to the referring agency the responsibility of notification. The answer is no.

*I*

The facts of the case are not seriously disputed: Arnold Reed was a heavy-equipment operator for the Woolston Construction Company. In 1991, Woolston entered into a contract with the I.T. Davey Corporation to perform work at a New Jersey landfill. Occupational Safety and Health Administration (OSHA) regulations required Reed to undergo a pre-employment physical. Davey contracted with Environmental Medicine Resources, Inc. (EMR) to perform the examinations for the Woolston workers. EMR, located in Georgia, subcontracted the examinations to Life Care Institute Inc. (Life Care), of Glassboro, New Jersey, an outpatient medical facility that provides various types of medical imaging services, physical therapy, and occupational medicine. Pursuant to the agreement between Davey and EMR, Reed's examination was to include, among other tests, a single, frontal X ray of the chest. The EMR–Life Care contract provided that Life Care's responsibility was to analyze the chest X ray and evaluate

it either as "normal" or "abnormal." If Life Care determined that the X ray was abnormal, it was to forward it to EMR within twenty-four hours. EMR took responsibility for "over-reads and evaluation to obtain a diagnosis ."

Dr. Michael H. Bojarski, an employee of Life Care, conducted Reed's physical. Another physician employed by Life Care, D.A. DePersia, M.D., a radiologist, was responsible for reading the chest X rays and reporting to Dr. Bojarski. Upon reviewing Reed's X ray, Dr. DePersia told Dr. Bojarski that Reed had a widened mediastinum, the cavity in the center of the chest. Dr. Bojarski testified that he could not "personally" see the widened mediastinum on the X ray but relied on the expertise of Dr. DePersia. It is an accepted medical fact that, among men in their twenties, a widened mediastinum may be an indicator of lymphoma, including Hodgkin's disease. Dr. DePersia also noted that Reed's heart was unusually large, a medical condition known as cardiomegaly. Reed was apparently aware of that condition.

Dr. Bojarski sent the X ray, along with the rest of Reed's examination package, to EMR. He noted that the X ray was abnormal and wrote "cardiomeg" in the comments section. No reference to the widened mediastinum was made. Although two days later Dr. DePersia gave Dr. Bojarski a written report on Reed's X ray recommending a follow-up CT-scan, Dr. Bojarski never conveyed that suggestion or the report to EMR. Inexplicably, on May 14, 1991, Dr. Michael Barnes of EMR wrote to Reed and informed him that he was in good health. In the letter he made no mention of the widened mediastinum or any potentially dangerous condition.

About six months later, in November 1991, Reed returned to Life Care for another examination. In the interim, he had lost 25 pounds and was suffering from flu-like symptoms. Dr. Bojarski did not ask Reed whether he had ever learned of or followed up on the widened mediastinum. In December 1991, Reed was admitted to the hospital and, after a chest X ray showed a large mass in his

mediastinum, he was diagnosed with Stage IIB Hodgkin's disease. Reed died eight months later on October 27, 1992, at the age of 28.

Linda Reed, executor of her husband Arnold's estate, brought suit on behalf of the estate and on her own behalf against Dr. Bojarski, Dr. DePersia, Life Care, EMR, and numerous John Doe defendants. Dr. DePersia was granted summary judgment and EMR settled with Reed, resulting in a stipulated dismissal. The case against Dr. Bojarski and Life Care went to trial.

At trial, Reed's counsel objected to the introduction of the EMR–Life Care contract because it appeared to limit Dr. Bojarski's duty toward Reed. He ultimately agreed to its admission if the court instructed the jury "that [agreements between EMR and Life Care] do not represent, necessarily, the law that they are going to apply." The trial court agreed and told the jury before defense counsel's opening statement: "the contractual relationship between E.M.R. and Life Care Institute does not necessarily result in the same relationship that exists as between the defendants in this case and the plaintiff. Those duties will be explained to you. . . ."

Reed presented two liability witnesses: Linda Reed and Dr. Maurice Cairoli, Arnold Reed's treating physician (an expert in medicine and oncology, although not an expert in occupational medicine), who testified regarding the standard of care applicable to Dr. Bojarski. In answering Reed's counsel's questions about the obligations of a physician in the circumstances of this case, Dr. Cairoli stated:

> That X ray has to be pursued. That X ray has to be acted upon. If a . . . certified radiologist who is entrusted with looking at an X ray and making a medical opinion says that the mediastinum is widened, until proven otherwise, the physician who has knowledge of these results must be concerned about the possibility of malignancy, must convey that information on to the patient, and must do further testing.

During the defense case, Dr. Bojarski and Leonard Kraus, President and Manager of Life Care, testified concerning the EMR–Life Care contract. The defendants also called Dr. George Mellendick as an expert in occupational medicine. Dr. Mellendick testified that, in an examination scheme like the one used by EMR

and Life Care, the common approach is for "the data [to] be centrally collated and transmitted in a sensible way." He further testified that he understood that Dr. Barnes had the "responsibility ... to get the information and to communicate directly to the patient-employee what the findings were.... [I]deally, we like one physician to collate the information and get it back to the patient."

Dr. Mellendick stated that the EMR–Life Care contract "clearly spelled out that [Life Care] would have certain responsibilities for getting data ... and forward[ing] anything which was abnormal." He testified that the arrangement between EMR and Life Care was "fairly standard" and that Dr. Bojarski's conduct was "reasonable" in light of the contract and typical practices in occupational medicine.

Both sides proposed jury instructions. Reed's version incorporated the traditional duties that flow from the existence of a doctor-patient relationship. Dr. Bojarski's version focused on the reasonableness of his conduct. Reed's counsel asked the Court to instruct the jury that Dr. Bojarski's duty to advise Reed is nondelegable, and that the duty exists notwithstanding the contract. The trial court agreed to instruct the jury that the contract affected only the relationship between EMR and Life Care.

The trial court properly informed the jury that a physician performing a pre-employment physical owes the examinee a duty of reasonable care in the conduct of the examination and that that duty encompasses taking reasonable steps to inform the examinee of findings that pose a danger to his health. He went on to say:

What plaintiff alleges is that upon the chest X ray having been read by Dr. DePersia, and she having discussed her finding, a possibility of a mediastinal abnormality, and suggesting CT scanning, that Dr. Bojarski breached the duty of reasonable care owed by him to the plaintiff, to inform the plaintiff directly or EMR of those X ray findings.

Dr. Bojarski, on the other hand, contends that he did act reasonably by reading the X ray, advising EMR that it was abnormal and forwarding the original X ray to EMR. Defendant Dr. Bojarski likewise alleges that EMR breached the standard of care by the letter written to Mr. Reed in light of the report of abnormal X ray mailed to EMR by Dr. Bojarski.

Now if you find that Dr. Bojarski satisfied his duty of reasonable care, and the duty to inform, then you may not find him negligent, and your verdict should be for the defendant. On the other hand, if you find Dr. Bojarski breached the duty owed by a reasonable care, including the duty to inform, your verdict should be for the plaintiff.

You must make the determination of whether Dr. Bojarski took reasonable steps to inform the plaintiff, Mr. Reed, of any findings under the facts of this case. In other words, you must determine whether it was reasonable for Dr. Bojarski to forward the materials concerning Mr. Reed to EMR and rely upon EMR's contractual obligation to review the materials and inform Mr. Reed of any adverse findings.

If you find that it was reasonable for Dr. Bojarski to expect EMR to do that, then you may not find Dr. Bojarski negligent. On the other hand, if you find that Dr. Bojarski acted unreasonably in relying on EMR to inform the patient of findings, and in not informing EMR or the plaintiff of Dr. DePersia's findings, including her letter to him diagnosing a widened mediastinum, you must determine Dr. Bojarski's conduct to have been negligent.

The following day, the jury unanimously determined that Dr. Bojarski had not deviated from accepted standards of medical care. Judgment was entered accordingly. Reed's motion for a new trial on all issues was denied.

Reed appealed. The Appellate Division affirmed the judgment entered upon the jury verdict in an unpublished *per curiam* opinion. After reviewing the facts and procedural history, the panel addressed the instruction in light of Reed's contention that the trial court erred in explaining Dr. Bojarski's duties and the extent to which those duties were defined by the contract between EMR and Life Care. The Appellate Division agreed with Reed that the contract could not alter Dr. Bojarski's duties, but concluded that it was proper for the trial court to allow the jury to use the contract to determine whether Bojarski's conduct was "reasonable." Because the sole issue of malpractice involved communication of the diagnosis, the panel determined that the charge, the testimony, and the jury's common sense provided a sufficient basis to sustain the verdict.

We granted Reed's petition for certification on February 3, 2000. 163 *N.J.* 75, 747 *A.*2d 283 (2000). We also granted amicus curiae status to the New Jersey State Board of Medical Examiners. The issue before us is as described above: whether a

physician, retained to perform a pre-employment physical, has a non-delegable duty to inform the patient of a potentially serious medical condition.

## II

Courts throughout the nation have been grappling with the question of the obligation owed by a physician to a patient in the pre-employment screening setting. *See* J.P. Ludington, Annotation, *Physician's Duties and Liabilities to Person Examined Pursuant to Physician's Contract with Such Person's Prospective or Actual Employer or Insurer,* 10 *A.L.R.*3d 1071 (1966)(collecting cases on the topic); *see also Green v. Walker,* 910 *F.*2d 291, 296 (5th Cir.1990)(holding that under Louisiana law, "when an individual is required, as a condition of future or continued employment, to submit to a medical examination, that examination creates a relationship between the examining physician and the examinee, at least to the extent of the tests conducted"); *Daly v. United States,* 946 *F.*2d 1467, 1470 (9th Cir.1991)(explaining that under Washington law, duty may be extended beyond doctor-patient relationship provided that examinee is foreseeably endangered by failure to make known to examinee abnormal findings); *Hoover v. Williamson,* 236 *Md.* 250, 203 *A.*2d 861, 863 (1964)(holding that even in absence of traditional physician-patient relationship, doctor may be subject to liability if his or her conduct warrants imposition of duty under general tort principles); *Lee v. City of New York,* 162 *A.D.*2d 34, 560 *N.Y.S.*2d 700, 701 (1990)(finding no duty in absence of physician-patient relationship unless physician affirmatively treats or advises employee concerning treatment and that treatment causes further injury).

Most jurisdictions adhere to the traditional malpractice model in which the absence of a classic physician-patient relationship results in the physician owing no duty to the examinee to discover and disclose abnormalities or conditions, let alone report them. *See, e.g., Hafner v. Beck,* 185 *Ariz.* 389, 916 *P.*2d 1105, 1108 (Ct.App.1995) (holding that psychologist conducting independent

medical examination on behalf of insurance carrier in connection with workers' compensation claim may not be subjected to liability for medical malpractice by workers' compensation claimant because physician's duty runs only to party requesting examination); *Felton v. Schaeffer*, 229 *Cal.App.*3d 229, 238–39, 279 *Cal.Rptr.* 713 (1991) (holding physician immune from medical malpractice action and ordinary negligence claim based on alleged misdiagnosis absent physician-patient relationship); *Rogers v. Horvath*, 65 *Mich.App.* 644, 237 *N.W.*2d 595, 597 (1975)(holding that physician's duty arises from physician-patient relationship and absent that relationship physician may not be subject to liability for malpractice); *LoDico v. Caputi*, 129 *A.D.*2d 361, 517 *N.Y.S.*2d 640, 641–42 (1987) (holding that absence of physician-patient relationship prevents plaintiff from recovering from examining physician for failure to diagnose brain tumor during disability examination); *Ervin v. American Guardian Life Assurance Co.*, 376 *Pa.Super.* 132, 545 *A.*2d 354, 358 (1988) (holding surgeon not liable for failure to diagnose and disclose cardiac disease on insurance exam because physician-patient relationship absent).

Two cases invoking the traditional model are instructive for their dissenting opinions that reveal movement away from the model. Indeed, in one of those jurisdictions, the dissenting view has subsequently been adopted as the majority rule. Both cases involve doctors who, in accordance with policy guidelines that required intermediary institutions to collate and transmit information, failed to disclose life-threatening abnormalities to examinees.

In *Beaman v. Helton*, 573 *So.*2d 776 (Miss.1990), *overruled by Meena v. Wilburn*, 603 *So.*2d 866 (Miss.1992), plaintiff sought Social Security benefits, and the Disability Determination Service (DDS) of Mississippi ordered an examination. *Id.* at 777. DDS employed a physician to conduct the examination during which X rays were taken revealing "probable pulmonary malignancy." *Ibid.* That night, in accordance with DDS guidelines requiring the agency to inform an examinee of a life threatening illness, the

doctor sent a report by telephone to DDS, specifically stating his impression that the plaintiff had a malignancy and recommending that the DDS examiner contact the plaintiff about this problem. *Ibid.* DDS, however, never informed the plaintiff of the abnormality. *Ibid.*

In resolving the subsequent malpractice suit against the doctor, the Supreme Court of Mississippi held that no physician-patient relationship existed and refused to impose a duty upon an examining physician independent of that relationship. *Id.* at 778. The court concluded that the doctor discharged his duty to the examinee when the doctor complied with the DDS guidelines in simply notifying the DDS examiner of the life-threatening condition. *Ibid.*

In a dissenting opinion, three justices fashioned alternative theories of liability. First, the dissent posited that an actual physician-patient relationship, although not coextensive with the traditional model, is created when a physician examines a person at the behest of a third party and that that relationship comes with an attendant duty to the extent of the examination. *Id.* at 783 (Sullivan, J., dissenting). Second, the dissent determined that the doctor also owes the plaintiff a common-law duty to conduct the examination with reasonable care, even in the absence of a doctor-patient relationship. *Ibid.* Under either theory, the dissent concluded that the plaintiff could reasonably expect the doctor, in a five-minute phone call, to notify him directly of a life-threatening condition that required immediate treatment. *Ibid.* "Under such circumstances, what, if any, duty does one human owe to another?" *Id.* at 779.

Two years later, in *Meena v. Wilburn*, 603 *So.*2d 866 (Miss. 1992), the Supreme Court of Mississippi adopted the latter of the two alternative theories of liability posited by the dissent in *Beaman.* The *Meena* court held that the absence of a physician-patient relationship will not insulate a physician from liability where the traditional elements of negligence are established. *Id.* at 869–70. The court explained that "[t]he presence or absence of

a doctor-patient relationship is simply a factor to consider in determining the type or nature of duty owed, if any, to the injured patient or non-patient." *Id.* at 870.

In a case closely paralleling *Beaman,* a Georgia appellate court in *Peace v. Weisman,* 186 *Ga.App.* 697, 368 *S.E.*2d 319 (1988), affirmed the classic malpractice approach. When Peace applied for Social Security benefits, the Disability Determination Service (DDS) retained a physician to conduct a physical examination. *Id.* at 319–20. Under guidelines that were in place, the physician was to report the results of the examination to the DDS only. *Id.* at 322.

The physician's report to the DDS contained an evaluation of a routine chest X ray that revealed an abnormality in the chest area. *Id.* at 320. DDS denied the application for benefits without providing the applicant a copy of the report or informing him of its contents. *Ibid.* Four months later, the applicant was diagnosed with lung cancer, the disease to which he shortly succumbed. *Ibid.* When the applicant's wife brought a medical malpractice action on behalf of her deceased husband against the physician for failing to diagnose and notify her husband of the lung cancer, the Georgia court held that the doctor could not be held liable for malpractice because of the absence of a physician-patient relationship. *Id.* at 320–21. The court found that the doctor's only duty was to avoid injuring the applicant during the examination. *Id.* at 321.

The dissent identified a physician-patient relationship resulting from the examination, given the examinee's reasonable expectations of disclosure and the evaluative purpose of the examination itself. *Id.* at 322 (Deen, P.J., dissenting). "Under these circumstances, who in the world would not have expected the doctor to tell him of any abnormal findings?" *Ibid.* The dissent noted that, under the majority opinion, "[t]he only one left uninformed is the one most affected by the information." *Id.* at 322–23. For the dissent, the facts favored a finding of a physician-patient relationship that in turn imposed on the examining physician a duty to

divulge to the applicant any abnormalities. *Id.* at 323. The dissenting opinion concluded that the "intolerable result" of the majority opinion "denies a remedy for a wrong, fosters irresponsibility on the part of such consulting physicians, and may allow unwitting bureaucrats to deprive a human being of a fighting chance to live." *Ibid.*

A second line of cases acknowledges that, even in the absence of a traditional physician-patient relationship in the pre-employment physical context, there is a disclosure requirement where the examination reveals a medical abnormality. For example, in *Daly v. United States, supra,* 946 *F.*2d at 1468, plaintiff, as part of a preemployment physical examination for the Veteran's Administration (VA) hospital, submitted to a chest X ray and tuberculosis test. *Ibid.* The radiologist's review of the X ray indicated an abnormality of the lung. *Ibid.* The radiologist, however, never informed the plaintiff. *Ibid.* For the next two years, plaintiff sought treatment several times for lung-related disorders at the VA employee health unit. *Ibid.* Further chest X rays were ordered, and the VA radiologist noted the lung abnormality but the radiologist again failed to inform Daly of the abnormality. *Id.* at 1469. Four years after the initial X ray, the plaintiff consulted a pulmonary specialist who diagnosed the lung disease sarcoidosis. *Ibid.* Sarcoidosis is incurable and potentially fatal, but prompt treatment may halt its progress. *Id.* at 1468. The plaintiff in *Daly* did not receive a diagnosis until the sarcoidosis had reached an irreversible advanced stage, rendering him permanently disabled. *Ibid.*

Although the Ninth Circuit refused to determine the "exact contours" of the doctor's duty to disclose, it nonetheless found persuasive expert testimony given at trial "that, at a minimum, the radiologist should have notified Daly of the abnormality." *Id.* at 1470. The court thus held that the VA radiologist had the "hardly burdensome" duty to inform Daly of what he detected in the X ray. *Ibid.*

Also instructive is *Betesh v. United States,* 400 *F.Supp.* 238 (D.D.C.1974), a case bearing some resemblance to this one. Betesh reported to an armed forces examination station in Maryland for a pre-induction physical examination. *Id.* at 241. A radiologist under contract with the Selective Service System, who read an enlargement of Betesh's X ray, observed an abnormality and prepared a report that stated "[t]he left hilium is slightly enlarged as to the upper mediastinum. This may be of no significance, but it is not possible to rule out sarcoid, tuberculosis adeniter, or lymphoma." *Ibid.* Betesh was never shown the radiologist's report or informed of the abnormality on the X ray. *Ibid.* He was rejected for service because of his abnormal X ray, but that explanation was not revealed to him, and he assumed the rejection was attributable to a knee injury. *Ibid.* When he was ordered to report to the same station six months later, he looked into his medical file. *Id.* at 242. Only then did he learn of the abnormality. *Ibid.* Three days later, a series of private diagnostic tests revealed Hodgkin's disease. *Ibid.* Although Betesh's form of Hodgkin's disease is successfully treatable at an early stage, his disease had progressed in six months to such an extent that cure was impossible. *Ibid.*

The court found that the government's duty to inform Betesh derived from specific federal regulations on point. *Id.* at 243–45. However, it also held that, regardless of any applicable federal regulations, the government was liable for breach of the standard of care under the common law of Maryland. More particularly, the Court stated that three theories had to be considered:

(1) Even in the absence of a doctor-patient relationship, a doctor who assumes to act must act carefully with respect to all aspects of the examination; (2) where a doctor acts primarily for the benefit of an employer in examining a prospective employee, the doctor must act carefully with respect to all aspects of the examination; (3) where a doctor-patient relationship exists, the doctor must act with care. [*Id.* at 245.]

The Court went on to declare that, under each of those theories, plaintiff could recover and that government physicians are "under a duty to act carefully, not merely in the conduct of the examination but also in subsequent communications to the examinee." *Id.*

at 246. The court, therefore, held that under Maryland common law the pre-induction physical imposed upon a physician "a duty to disclose what he had found and to warn the examinee of any finding that would indicate that the patient is in danger and should seek further medical evaluation and treatment." *Id.* at 247. The court added, "[t]his duty is stronger when the physician has no reason to believe that the examinee is aware of the condition and danger." *Ibid.*

Another third party examination case arose in the insurance setting. In *Deramus v. Jackson National Life Insurance Co.*, 92 *F.*3d 274, 275 (5th Cir.1996), the wife of a decedent who died of Acquired Immune Deficiency Syndrome (AIDS) brought an action against a life insurance company that had rejected decedent's life insurance application. The plaintiff alleged that the insurer had a duty to inform decedent and his wife or their private physician that decedent's blood had tested positive for Human Immunodeficiency Virus (HIV) during the examination the insurer required of all applicants. *Id.* at 277. The Fifth Circuit held that under Mississippi law an insurance company has no duty to divulge the results of a medical examination to an applicant, *id.* at 280, but that a physician, regardless of whether a doctor-patient relationship exists, has a duty to disclose because a doctor's "disclosure to, at least, the patient is essential to the treatment and retardation of diseases and other ailments." *Ibid.*

Three broad categories can be discerned from those cases. The majority rule embraces the traditional medical malpractice model and focuses on the absence of the classic physician-patient relationship in third-party examinations. Courts adhering to that rule find that a physician, examining a person at the behest of a third party, at most owes the extremely limited duty to simply avoid harming the examinee during the examination. A second category includes those courts willing to find that a third-party physician's act of examining someone creates a doctor-patient relationship or a nontraditional doctor-patient relationship to the extent of the examination. A third category incorporates courts that find no

doctor-patient relationship, but impose the duty to act with reasonable care based on common-law negligence principles. Courts in the second and third categories typically find that a physician in a pre-employment examination setting owes an examinee an affirmative and direct duty of disclosure when an examination uncovers any previously unknown, life-threatening disease.

### III

New Jersey has long recognized that a physician owes a duty of reasonable care to the nontraditional patient in the context of a third-party examination. Neil J. Squillante, Comment, *Expanding the Potential Tort Liability of Physicians: A Legal Portrait of "Nontraditional Patients" and Proposals for Change*, 40 *UCLA L.Rev.* 1617, 1637 (1993). Over 35 years ago in *Beadling v. Sirotta*, 41 *N.J.* 555, 197 *A.2d* 857 (1964), this Court began its march away from applying the traditional medical malpractice paradigm. George Beadling applied for a job as a machinist and his would-be employer scheduled a pre-employment physical that included a chest X ray. *Id.* at 557, 197 *A.2d* 857. The radiologist who examined Beadling found a lung abnormality that he believed to be evidence of active tuberculosis. *Id.* at 557–58, 197 *A.2d* 857. Beadling was not hired and, after the personnel manager recommended that Beadling see his own doctor, he was admitted to the hospital for treatment of tuberculosis. *Id.* at 558, 197 *A.2d* 857. The record failed to establish whether Beadling had suffered from active tuberculosis during the time at issue. *Id.* at 559–60, 197 *A.2d* 857.

Beadling sued numerous parties, including the radiologist. *Id.* at 556, 197 *A.2d* 857. The radiologist defended on the ground that he had no physician-patient relationship with Beadling, and, therefore no corresponding duty. *Id.* at 561, 197 *A.2d* 857. In a bench trial, the Law Division found in favor of Beadling, and we granted certification on our own motion. *Id.* at 556, 197 *A.2d* 857. Although we recognized that the relationship of an employee and a physician, to whom the latter is referred for a pre-employment

physical, is not a traditional doctor-patient relationship, we nevertheless declared "that a physician in the exercise of his profession examining a person at the request of an employer owes that person a duty of reasonable care." *Id.* at 561, 197 *A.*2d 857. However, we declined to fix the boundaries of the duty on the ground that there was no evidence that any breach existed in that case. *Id.* at 561–62, 197 *A.*2d 857.

*Beadling* formed the foundation for the case most relevant here—*Ranier v. Frieman,* 294 *N.J.Super.* 182, 682 *A.*2d 1220 (App.Div.1996)—in which the Appellate Division affirmed the existence of a non-traditional physician-patient relationship in the pre-employment physical setting and invoked traditional negligence principles in divining a duty of reasonable care on the part of the physician so engaged. *Id.* at 184, 189, 682 *A.*2d 1220. There, Penice Ranier who worked as a driller of boards for personal computers claimed that vision problems were making it impossible for him to continue and sought social security disability benefits. *Id.* at 184, 682 *A.*2d 1220. The Department of Labor, Division of Disability Determinations (Division), referred Ranier to an ophthalmologist to determine whether he was disabled. *Id.* at 185–86, 682 *A.*2d 1220. The ophthalmologist reported that Ranier was able to work, and he was denied benefits. *Id.* at 186, 682 *A.*2d 1220. As time passed, Ranier's vision problems continued, and, after further examination, Ranier's own ophthalmologist diagnosed a brain tumor in his optic chasm. *Ibid.* Ranier brought a malpractice action against the ophthalmologist retained by the Division. The physician, in turn, moved for summary judgment on the ground that, because he was involved in screening rather than treating and was paid by the Department of Labor, he did not owe Ranier a duty of reasonable care. *Id.* at 186–87, 682 *A.*2d 1220. The trial court granted summary judgment. *Id.* at 186, 682 *A.*2d 1220.

The Appellate Division reversed, having satisfied itself that there was

nothing in the decisional law of this jurisdiction and, indeed, nothing in the common understanding of the community regarding medical professional standards that would immunize a physician from liability for a professionally unreasonable diagnosis to the substantial detriment of the examinee, even if the examination is made at the expense and behest of a third party.

[*Id.* at 187, 682 *A.*2d 1220.]

The court declared that it is not necessary to denominate the pre-employment physical as creating a traditional doctor-patient relationship in order to find the existence of a duty: "The substantive content of reasonable care in the third-party situation is dependent upon relevant negligence principles applied consistently with appropriate public policy concerns." *Id.* at 188, 682 *A.*2d 1220. Judge Pressler, writing for the panel, noted that the existence of a duty is a matter of law, *id.* at 189, 682 *A.*2d 1220, and that the doctor who examined Ranier had owed him a duty "to make a professionally reasonable and competent diagnosis." *Id.* at 190, 682 *A.*2d 1220. The court stated that Ranier's reliance on the Division-retained ophthalmologist to make a competent diagnosis was reasonable and foreseeable, and in keeping with public policy and community expectations, *id.* at 190–91, 682 *A.*2d 1220, stating that

when an individual is required, as a condition of future or continued employment, to submit to a medical examination, that examination creates a relationship between the examining physician and the examinee, at least to the extent of the tests conducted. This relationship imposes upon the examining physician a duty to conduct the requested tests and diagnose the results thereof, exercising the level of care consistent with the doctor's professional training and expertise, and to take reasonable steps to make information available timely to the examinee of any findings that pose an imminent danger to the examinee's physical or mental well-being.

[*Id.* at 191, 682 *A.*2d 1220 (quoting *Green v. Walker, supra,* 910 *F.*2d at 296).]

 In short, under *Ranier,* when a person is referred to a physician for a pre-employment physical, a physician-patient relationship is created at least to the extent of the examination, and a duty to perform a professionally reasonable and competent examination exists. A professionally unreasonable examination that is detrimental to the examinee is not immunized from liability because a third-party authorized or paid for the exam. Included within the notion of a reasonable and competent examination is the

need to "take reasonable steps to make information available timely to the examinee of any findings that pose an imminent danger to the examinee's physical or mental well being." *Ranier v. Frieman, supra,* 294 *N.J.Super.* at 191, 682 *A.*2d 1220 (quoting *Green v. Walker, supra,* 910 *F.*2d at 296).

We fully subscribe to that articulation of the duty of a physician performing a pre-employment physical examination under contract to a third party. As we have often said, " 'whether a duty exists is ultimately a question of fairness. The inquiry involves a weighing of the relationship of the parties, the nature of the risk, and the public interest in the proposed solution.' " *Kelly v. Gwinnell,* 96 *N.J.* 538, 544, 476 *A.*2d 1219 (1984) (quoting *Goldberg v. Housing Auth.* 38 *N.J.* 578, 583, 186 *A.*2d 291 (1962)). A duty is said to arise out of the existence of a relationship between the "parties such that social policy justifies" its imposition. W. Page Keeton et al., *Prosser & Keeton on the Law of Torts,* § 56, at 374 (5th ed.1984).

■ Although the pre-employment physical clearly does not establish a traditional physician-patient relationship, that is of no moment. The exact nature of the relationship is simply a factor to be considered in determining what duty exists. What is crucial is that a relationship is created in which a physician is expected to exercise reasonable care commensurate with his expertise and training, both in conducting the examination and in communicating the results to the examinee. Concomitantly, the patient is entitled to rely on the physician to tell him of a potential serious illness if it is discovered. Any reasonable person would expect that and the duty to communicate with a patient who is found to be ill is non-delegable. When the doctor who ascertains the abnormality communicates it directly to the patient, he or she has the best chance of obtaining prompt remedial care and the best hope of avoiding falling through the cracks of a multi-party system. To the extent that a contract purports to insulate the examining physician from liability for breaching the duty to communicate abnormalities found in a pre-employment exam, it violates the basic public policy

of New Jersey, along with common law notions of duty embodied in our case law.

Indeed, *N.J.A.C.* 13:35–6.5(f) describes our public policy regarding the scope and extent of the duty a physician owes to a person he or she examines at the behest of a third party in terms that are identical to those we here adopt:

> Where a third party or entity has requested examination, or an evaluation of an examinee, the licensee rendering those services shall prepare appropriate records and maintain their confidentiality, except to the extent provided by this section. The licensee's report to the third party relating to the examinee shall be made part of the record. The licensee shall:
>
> 1. Assure that the scope of the report is consistent with the request, to avoid the unnecessary disclosure of diagnoses or personal information which is not pertinent;
>
> 2. Forward the report to the individual entity making the request, in accordance with the terms of the examinee's authorization; if no specific individual is identified, the report should be marked "Confidential"; and
>
> 3. Not provide the examinee with the report of an examination requested by a third party or entity unless the third party or entity consents to its release, *except that should the examination disclose abnormalities or conditions not known to the examinee, the licensee shall advise the examinee to consult another health care professional for treatment.*
>
> [*Ibid.* (emphasis added).]

Although it is not a model of draftsmanship, that regulation of the Board of Medical Examiners recognizes contracts like those between EMR and Life Care that prescribe that examination results in a pre-employment setting will generally be forwarded to the requesting agency and not to the examinee. However, the regulation carves out a crucial exception bearing on the case before us. That exception requires the examining physician, where the examination discloses "abnormalities or conditions not known" to the examinee, to advise him or her to consult another physician for treatment. *N.J.A.C.* 13:35–6.5(f)(3).

According to the Board of Medical Examiners, *N.J.A.C.* 13:35–6.5(f) reflects a judgment that the duty owed by an examining physician to an individual being examined, even when that individual is not a traditional patient, includes and encompasses an affirmative obligation of disclosure in those circumstances where

potentially life-threatening abnormalities or conditions are discovered during the course of examination. It makes no difference that the examination is conducted at the behest of a third party because an ordinary person is likely to interpret—and thus rely on—a physician's silence to mean that the physician detected no previously unknown abnormalities during the examination.

The Board's rule is in accord with other ethical pronouncements on the issue, including a recent opinion of the American Medical Association's Council on Ethical and Judicial Affairs (Council) that states:

> When a physician is responsible for performing an isolated assessment of an individual's health or disability for an employer, business, or insurer, a limited patient-physician relationship should be considered to exist. . . .
>
> *Despite their ties to a third party, the responsibilities of [industry employed physicians] and [independent medical examiners] are in some basic respects very similar to those of other physicians .*
>
> . . . .
>
> *The physician has a responsibility to inform the patient about important health information abnormalities that he or she discovers during the course of the examination. In addition, the physician should ensure to the extent possible that the patient understands the problem or diagnosis. Furthermore, when appropriate, the physician should suggest that the patient seek care from a qualified physician and, if requested, provide reasonable assistance in securing follow-up care.*
>
> [Council on Ethical and Judicial Affairs, American Medical Association, Opinion E–10.03 (AMA opinion), *Patient–Physician Relationship in the Context of Work–Related and Independent Medical Examinations,* Current Opinions, issued Dec. 1999, based on report *Patient Physician Relationship in the Context of Work–Related and Independent Medical Examinations,* adopted June 1999 (Emphasis added).]

Although neither *N.J.A.C.* 13:35–6.5(f) nor the AMA Opinion state explicitly that a physician's duty in the described circumstances is not delegable, that notion is implicit in their formulation. Each recognizes contracts like the one between EMR and Life Care, but each is careful to preserve the duty of the physician, who discovers an abnormality, to inform the patient of the discovery; to advise him or her to consult another health care professional; and, in the case of the AMA opinion, to ensure that the

patient understands the problem or diagnosis and, if requested, assist the patient in securing medical follow up.

There is nothing earth shaking about those principles. Indeed we believe them to fall squarely within our established jurisprudence as exemplified by the seminal decision in *Beadling,* and the more extensive analysis in *Ranier,* and to accord with the fundamental notions of duty embodied in our jurisprudence and in the developing caselaw across the country.[1]

## IV

Here, although Davey paid EMS, which in turn contracted with Life Care, on the day of the examination, Dr. Bojarski and Reed entered into a relationship in which Bojarski owed Reed a duty of reasonable care to the extent of the examination and in communicating its outcome. In light of the evaluative purpose of the exam, Reed concomitantly relied on Dr. Bojarski's superior knowledge to assess the state of his health. Subsumed in that reliance was an entirely reasonable belief that, if Dr. Bojarski had found a potentially life threatening abnormality, he would not have remained silent about it. Whatever else Reed might reasonably have expected of the doctor performing his pre-employment physical, he had an absolute right to expect that he would be told if something was wrong. No contract by the Doctor or his employer with a third party could relieve Dr. Bojarski of that obligation.

The admission of the EMR–Life Care contract before the jury on the issue of the "reasonableness" of Dr. Bojarski's actions was reversible error. It left the jury with the clear impression that it was free to find, consonant with Dr. Bojarski's expert's opinion, that Dr. Bojarski behaved "reasonably" in delegating to EMR the duty to advise Reed of his potentially dangerous medical condition.

---

1 Nothing in this opinion should be viewed as requiring a physician to whom a patient has been referred by an examining physician for diagnostic tests (for example, a pathologist or radiologist) to convey the test results directly to the patient.

As we have indicated, that is not so. Whatever contract Dr. Bojarski was operating under did not relieve him of the responsibility to inform Reed of his ailment.

## V

The judgment entered upon the jury verdict is reversed. The matter is remanded for trial in advance of which the trial court should determine whether to direct a verdict in favor of plaintiff on liability.

VERNIERO, J., concurring.

I join the Court's opinion. I interpret its holding as imposing a duty on the physician to examine the individual competently, within the parameters of the third-party referral, and to disclose to that examinee any potentially serious condition revealed by the examination. Although the Court cites approvingly to that portion of *Ranier v. Frieman,* 294 *N.J.Super.* 182, 190, 682 *A.*2d 1220 (App.Div.1996), in which the Appellate Division articulated that the examining physician's duty is "to make a professionally reasonable and competent diagnosis," *ante* 166 *N.J.* at 105, 764 *A.*2d at 442, it does so strictly in the context of an examination requested by a third-party entity. I do not interpret the Court's holding as imposing a duty on the examining physician to discover or diagnose potential ailments beyond the scope of the third-party referral.

The Court's approach resembles the approach reflected in *N.J.A.C.* 13:35–6.5. That regulation provides that a licensee in Dr. Bojarski's position must disclose to examinees any "abnormalities or conditions" revealed by the examination and not known to them. *N.J.A.C.* 13:35–6.5(f). In my view, that provision establishes a non-delegable duty on the part of physicians to disclose such information to persons, like Mr. Reed, who are examined at the request of employers or other third-party entities. Persons examined by physicians in those circumstances have a right to be informed of any negative results.

Moreover, *N.J.A.C.* 13:35–6.5(f) is careful to denote persons who are examined in the employment-screening context as "examinees" as opposed to "patients." The regulation defines an examinee as a "person who is the subject of professional examination where the purpose of that examination is unrelated to treatment and where a report of the examination is to be supplied to a third party." *N.J.A.C.* 13:35–6.5(a). A patient, on the other hand, is defined as "any person who is the recipient of a professional service ... for purposes of treatment or a consultation relating to treatment." *Ibid.* The regulation thus contemplates a circumscribed relationship between the examining physician and examinee in the employment-screening context.

*For reversal and remandment*—Chief Justice PORITZ and Justices STEIN, COLEMAN, LONG, VERNIERO, LaVECCHIA and ZAZZALI—7.

*Opposed*—None.