811 A.2d 460 (2002)
356 N.J. Super. 4
Esther A. SINCLAIR, as Executrix of the Estate of William A. Sinclair and Esther A. Sinclair, as Executrix Ad Prosequendum on behalf of the heirs of William A. Sinclair, Plaintiff-Appellant,
v.
Steven B. ROTH, M.D., Defendant-Respondent, and
Francis Bottone, M.D., Roxbury Family Practice, John Doe, M.D. 1-50, Jane Doe, M.D. 1-50, John Doe, R.N. 1-50, Jane Doe, R.N. 1-50, John Doe, 1-50, Jane Doe 1-50, John Doe, Corp. 1-50 (fictitious names), Defendants.
Superior Court of New Jersey, Appellate Division.
Argued October 8, 2002.
Decided November 27, 2002.
*461 E. Drew Britcher, Morristown, argued the cause for appellant (Britcher, Leone & *462 Roth, attorneys; Mr. Britcher, of counsel; Jessica Choper, on the brief).
Catherine J. Flynn, New Providence, argued the cause for respondent (Tafaro & Flynn, attorneys; Ms. Flynn, of counsel; Leonard S. Rothbard, on the brief).
Before Judges STERN, COLLESTER and ALLEY.
The opinion of the court was delivered by
STERN, P.J.A.D.
Plaintiff appeals from a judgment based on a verdict of no cause for action in a medical malpractice case. Plaintiff also appeals from the denial of her motion for new trial. The case deals with a reading by defendant, Dr. Steven Roth, of a stress test and his failure to alert plaintiff's decedent and referring doctor to the impact of his findings and of his recommendations for treatment. Plaintiff asserts on appeal that the trial judge should have charged that defendant had a duty under Reed v. Bojarski, 166 N.J. 89, 764 A.2d 433 (2001), to advise decedent of his findings. Defendant insists that a specialist owes no such duty, that he need not communicate directly with the patient, and that his medical obligation is only to report the test results to the referring physician. Given the issues and testimony developed at the trial, the procedural posture in which the issue of duty to communicate subsequently arose, and footnote one in the Reed opinion, we affirm the judgment.

I.
In February 1995, William A. Sinclair, who was fifty-eight years old at the time, visited Dr. Francis Bottone, his personal physician, complaining of a recent episode of chest pain. Dr. Bottone referred Sinclair to defendant to perform a stress test. The stress test was performed on March 6, 1995, and was interpreted by defendant as being within "normal" limits. Sinclair died on March 17, 1995. Plaintiff attributes his death to defendant's negligence in reading and "respond[ing] to the findings of the stress test."
Defendant testified that decedent was referred to his office only for a stress test in order to "have chest pain evaluated as to whether we could establish the cause." If a patient was referred "for cardiac evaluation," he would "make a recommendation for therapy or further testing," and communicate to the referring doctor "[d]epending on the severity of the problem." When a patient is referred for a specific test, he provides a report of the results to the referring doctor. Defendant described his findings in this case as follows:
Firstly, as previously stated blood pressure was elevated at rest. So I could not personally ascertain whether that was an event of the day or the moment or whether that was a chronic situation. And I point out on this report that his blood pressure was elevated at resting.... Secondly, there was a heart murmur that was noted that certainly is necessity stated, at least his, at least knowing about which I had no way of knowing whether he was aware of that. And thirdly, this was the issue of this ventricular couplet that may or may not have any cardiac significance, but he needed to know about that so that was in the report.
Q. Would it be fair to say you did not call Doctor Bottone the day of the stress test or at any time between the time of the stress test and the time of Mr. Sinclair's death at least relative to Mr. Sinclair, correct?
A. Correct.
....

*463 Q. So you didn't think it important to call his family practitioner as a cardiologist and say, this patient had increased resting blood pressure, as to my findings that could be consistent with left ventricular hypertrophy, which we know can be brought about by chronic long-lasting hypertension and I note he's not on any medication, perhaps you might want to think about starting him on some type of blood pressure control, whatever the type of medication that might be.
A. Since I knew he would be receiving this report in a matter of three days, four days, I would not ordinarily call a doctor to advise him under these circumstances about that type of issue.
Q. Did [you] ever have a patient sent by a doctor for a stress test who you admitted to the hospital the day of the test?
A. Yes.
Defendant further testified that he did not think that the irregularities noted in decedent's case were an emergency. He stated "[i]f there was any abnormality that I thought required either immediate attention or attention within the next few days, or even the next week, I would have called the attending physician."[1] Defendant stated that after performing stress tests he gives the patient "a preliminary assessment" and told Mr. Sinclair that he "did not see any significant abnormality." Decedent's wife testified that her husband recounted such a conversation to her.
Plaintiff's expert, Dr. William Burke, testified that the test results revealed that decedent should have been immediately admitted to the hospital for "monitoring," and "evaluation" and given beta blocker medication. According to Dr. Burke, defendant breached the standard of care by not taking such action.
Defendant's expert, Dr. Jonathan Goldstein, testified that defendant did not deviate from the appropriate standard of care, and that he was only obligated to send a report to the referring physician. He also agreed with defendant that neither the preliminary EKG nor stress test itself indicated the need for hospitalization or "medical intervention." Accordingly, there was "nothing Doctor Roth was to do other than [to send Dr. Bottone] that stress test report." Dr. Goldstein also opined that decedent suffered neither a myocardial infarction nor heart attack prior to death, even though the autopsy report, which did not determine a cause of death, speculated that decedent had a myocardial infarction.
On March 19, 2001, upon the conclusion of the evidence and prior to summations, the judge indicated that the parties had reviewed the proposed charge and verdict sheet to which no objection was noted. The summations of both parties were then given.
The next day, prior to the charge to the jury, the plaintiff asked the judge to consider modifying the charge to comport with what counsel believed was a then recent decision of this court in a medical malpractice case.
I wanted to alert the Court that in thinking upon the charge after summations yesterday I recognized that one of the issues that has been raised by the *464 defense in this case is that they have argued repetitively that the doctor had been assigned purely the task of performing a stress test, and that was all... Now, I reflected, on my journey here today ... And I thought of the case that had come down, the cites for which I've been unable to find so far ... I believe it was an employment situation where an individual was retained by the employer to perform an examination of an individual, and in the process discovered a physical condition of that individual which he did not report to that individual, which would have and could have been treated ... It's my position that as a matter of law that decision should be considered in the context of a case such as this to determine that this doctor cannot excuse his conduct on the idea that his duty was to merely report back to the general practitioner and not deal[] directly to Mr. Sinclair of the existence of certain medical conditions for which medical treatment could have and should have been rendered ... And I have asked the Court to consider modifying the charge accordingly. I recognize it would be an extension. (Emphasis added.)
Counsel was obviously referring to the Supreme Court's opinion in Reed, which had been decided about two months before.
Although plaintiff did not know the cite, the judge was familiar with the case and agreed that it was "probably the law, and would be the law that I would apply." However, the judge decided not to amend the jury charge from that previously approved by counsel because there was no prior objection to the proposed instructions nor any request to the charge presented, and because summations had already been completed. The judge stated:
I don't have to determine whether a referral doctor, such as a cardiologist, has a duty to the patient to disclose an abnormality. That may be and probably is the law. But I don't have to get into that because the plaintiff has been aware, for at least 14 months, that the defendant has contended all along that the duty was to the attending physician,... but ... plaintiff's expert tried to counteract that, and he said that there was a duty to the patient ... under the facts of this case.... The defendant's experts denied it under oath. And I don't think it is proper or fair for me to amend my charge without giving a new summation, which has not been requested, and if it had been requested it would unduly highlight this particular issue. And therefore I'm not going to make any change in the charge which was approved by counsel prior to the summations yesterday.
....
I might add it's disturbing to the Court, where I try so hard to get requests to charge prior to the case, during the case, and even when I prepare my charge, and then after summations get a request to change my charge.
Thus, the judge charged the jury with the Model Jury charge which stated in part, as follows:
You, as jurors, should not speculate or guess about the standards by which the defendant physician should have conducted himself in the diagnosis of Mr. Sinclair. Rather you must determine the applicable medical standard from the testimony of the expert witnesses you've heard in this case. Where there's a conflict in the testimony of the medical experts on a subject it is for you, the jury, to resolve that conflict, using the same guidelines in determining credibility that I mentioned earlier....
Now, the law recognizes that the practice of medicine is not an exact science.

*465 Therefore, the practice of medicine according to accepted medical standards may not prevent a poor or unanticipated result. Therefore, whether the defendant doctor was negligent depends not on the outcome, but on whether he adhered to or departed from the applicable standard of practice and care.
The jury determined that Doctor Roth did not deviate from accepted standards of medical practice. Plaintiff's motion for a new trial was thereafter denied.[2]

II.
Plaintiff contends that:
[T]he jury charge was erroneous because it failed to explain to the jury that as a matter of law, defendant had an obligation to tell the plaintiff of the significance of his findings and either initiate treatment or make certain that the referring physician was advised of the significance of the findings and the need to initiate treatment.
Plaintiff argues that the court should have charged the jury in accordance with the principles set forth by the court in Reed v. Bojarski, 166 N.J. 89, 764 A.2d 433 (2001), and that the jurors should have been instructed that "if they determined that there was a condition that created an increased risk of sudden cardiac death, then the Defendant had a non-delegable duty to report that information to the referring physician and to make recommendations for treatment." Plaintiff further contends that pursuant to Reed,
[i]n the context of a referral from a general or family practitioner, the patient is entitled to rely on the consulting physician to advise the referring physician of specialized findings important to the treatment of potentially life threatening conditions known to the specialist, but, potentially unknown to the general practitioner.
Defendant responds that the plaintiff's present argument does not reflect the law as it applies to this case because Reed "only refers to the duty a physician owes to a patient [that was] referred to the physician by an employer." Defendant argues that Reed is distinguishable because here (1) the plaintiff was not referred by his employer, and (2) the plaintiff was under a doctor's care at all times, and was only referred to defendant for a stress test.
There is little doubt that the specialist has a duty to advise the referring physician of his findings. See Jenoff v. Gleason, 215 N.J.Super. 349, 357-59, 521 A.2d 1323 (App.Div.1987). There was no dispute on that at trial, and plaintiff made no request for a charge on the subject at the charge conference. We find no plain error in the charge with respect to defendant's duty to communicate with Dr. Bottone. This is particularly true because the issue developed before the jury related to the need for defendant to take immediate action, and the timeliness of his report to Dr. Bottone, not whether he had a duty to report.
With respect to the duty to communicate with the patient, Reed concerned the responsibility of a physician who is paid by an employer, or some entity with which the employer contracts, to examine a prospective or current employee. The issue before the Court was "whether a physician, performing a pre-employment screening, who determines that the patient has a potentially serious medical condition, can omit informing the patient and delegate by contract to the referring agency the responsibility of notification." 166 N.J. at *466 91, 764 A.2d 433. There, the I.T. Davey Corporation contracted with Emergency Medical Resources, Inc. ("EMR") to conduct physical examinations required by OSHA for the employees working on a landfill project. Id. at 91, 764 A.2d 433. EMR contracted with the Life Care Institute Inc. to do the physical examination and its Dr. Bojarski never reported his findings to EMR or decedent. Decedent's Hodgkin's disease could have been treated if timely reported. Id. at 92-93, 764 A.2d 433.
In her opinion, Justice Long thoroughly exhausted the law regarding the obligation of a third party who conducts physicals for an employer to report findings to the employee:
Three broad categories can be discerned from those cases. The majority rule embraces the traditional medical malpractice model and focuses on the absence of the classic physician-patient relationship in third-party examinations. Courts adhering to that rule find that a physician, examining a person at the behest of a third party, at most owes the extremely limited duty to simply avoid harming the examinee during the examination. A second category includes those courts willing to find that a third-party physician's act of examining someone creates a doctor-patient relationship or a nontraditional doctor-patient relationship to the extent of the examination. A third category incorporates courts that find no doctor-patient relationship, but impose the duty to act with reasonable care based on common-law negligence principles. Courts in the second and third categories typically find that a physician in a pre-employment examination setting owes an examinee an affirmative and direct duty of disclosure when an examination uncovers any previously unknown, life-threatening disease.
[Reed v. Bojarski, 166 N.J. 89, 102-103, 764 A.2d 433.]
After further reviewing New Jersey precedent, Justice Long concluded that the absence of a "traditional physician-patient relationship ... is of no moment." Id. at 106, 764 A.2d 433.
The exact nature of the relationship is simply a factor to be considered in determining what duty exists. What is crucial is that a relationship is created in which a physician is expected to exercise reasonable care commensurate with his expertise and training, both in conducting the examination and in communicating the results to the examinee. Concomitantly, the patient is entitled to rely on the physician to tell him of a potential serious illness if it is discovered. Any reasonable person would expect that and the duty to communicate with a patient who is found to be ill is non-delegable. When the doctor who ascertains the abnormality communicates it directly to the patient, he or she has the best chance of obtaining prompt remedial care and the best hope of avoiding falling through the cracks of a multi-party system. To the extent that a contract purports to insulate the examining physician from liability for breaching the duty to communicate abnormalities found in a pre-employment exam, it violates the basic public policy.

[Id.]
The Court also referred to N.J.A.C. 13:35-6.5(f)(3) which requires an examining physician who examines for a third party to disclose "abnormalities or conditions not known" to the examinee and to advise him or her to consult another physician for treatment:
According to the Board of Medical Examiners, N.J.A.C. 13:35-6.5(f) reflects a *467 judgment that the duty owed by an examining physician to an individual being examined, even when that individual is not a traditional patient, includes and encompasses an affirmative obligation of disclosure in those circumstances where potentially life-threatening abnormalities or conditions are discovered during the course of examination. It makes no difference that the examination is conducted at the behest of a third party because an ordinary person is likely to interpretand thus rely ona physician's silence to mean that the physician detected no previously unknown abnormalities during the examination.

[166 N.J. at 107-108, 764 A.2d 433.]
Thus, the Court ruled that the examining physician had a duty to the patient.
However, the Court included a footnote at the end of its analysis. It states "[n]othing in this opinion should be viewed as requiring a physician to whom a patient has been referred by an examining physician for diagnostic tests (for example, a pathologist or radiologist) to convey the test results directly to the patient." Id. at 109, 764 A.2d 433. The footnote does not address the role of a cardiologist like defendant who, unlike most pathologists or radiologists, had direct personal contact and communication with the decedent. Neither does the footnote address all "specialists," but the reference to "a pathologist or radiologist" is by way of "example," and is not exhaustive. In fact, based on its facts, Reed is premised on the patient's lack of relationship with a doctor of his own and the obligation of the only medical physician with whom the patient has contact.
As an intermediate appellate court,[3] we will not expand Reed or footnote one to require a specialist, and particularly one to whom a patient has been referred for diagnostic testing, to communicate directly with the patient in the absence of an emergency which was disputed in this case. This is especially so because, as already noted, under New Jersey law a specialist has the recognized duty of communicating with the treating or primary care physician, Jenoff v. Gleason, supra, 215 N.J.Super. at 357-59, 521 A.2d 1323, although "[t]he trier of fact should be permitted to pass on the issue of the adequacy of or "the appropriate method of communicating" the specialist's findings. Ibid. This was done in this case, and our research reveals that a distinction is still made between a consulting physician and a physician to whom a patient is referred for a "second opinion." "The primary duty of a consulting physician is to advise and make recommendations to the treating physician himself who may, then, with full knowledge of the patient's history and other conditions, make the ultimate decision as to the scope of the information that should be given to the patient." O'Neal v. Hammer, 87 Hawai'i 183, 190, 953 P.2d 561, 568 (1998), quoting Prooth v. Wallsh, 105 Misc.2d 603, 607, 432 N.Y.S.2d 663, 666 (N.Y.Sup.Ct.1980).
We are, in any event, satisfied that any error in the charge was harmless in *468 light of the proofs and issues developed before the jury. There was no dispute that defendant advised decedent of his preliminary findings, told him that they were essentially normal, and sent a written report to Dr. Bottone. The plaintiff contended that defendant did not properly evaluate the test results and take appropriate action to monitor and evaluate decedent's condition.[4] Defendant's alleged negligence essentially went to his evaluation of Sinclair's condition. Additional communications would have had no impact if their contents were wrong.
Given the procedural posture of this case, the lack of request for an instruction about the duty to communicate with the referring doctor or a timely request with respect to the patient, and the expert testimony, including defendant's testimony of his obligation to communicate with the patient and referring physician in emergent circumstances, we find no plain error because of the judge's failure to charge on the duty to communicate.
Accordingly, the judgment is affirmed.
NOTES
[1] At a side bar conference during defendant's cross-examination, defense counsel stated "[t]here is no allegation of deviation in this case that my client was required to contact Doctor Bottone and make treatment recommendations." Plaintiff's attorney indicated he was trying to show defendant "didn't even bother to make treatment recommendations, let alone even undertake treatment of the patient." The trial judge permitted plaintiff to develop what defendant considered his "role" in reporting findings and recommendations for treatment.
[2] We have no transcript of any argument on the motion.
[3] We have the "principal responsibility of ensuring fidelity to existing law," enabling the Supreme Court "`(in conjunction with [its] discretionary jurisdiction) to engage in [its] law development role.'" Jeffrey W. Grove, Supreme Court Monitoring of State Courts in the Twenty-first Century: A Response to Professor Solimine, 35 Ind. L.Rev. 365, 371 (2002), quoting Michael E. Solimine, Supreme Court Monitoring of State Courts in the Twenty-first Century, 35 Ind. L.Rev. 335, 360 (2002).
[4] In his summation, plaintiff argued that defendant "ignored" certain factors in conducting the test, and added: "I'm not saying he had to write him a prescription that day. But I'm suggesting to you that saying it's within normal limits, go home, and never calling the doctor yourself to say he needs some treatment, and here's why, that's a deviation." Plaintiff's counsel also commented about Mrs. Sinclair's testimony about her conversation with defendant. Plaintiff contended it was not as detailed as defendant suggested and that the advice that "everything was normal" was erroneous.